## SUSANA MARTINEZ DE MERLE v. H. MATHEWS et als.

JUDGMENT NOT REVERSED FOR ERRORS UNLESS THEY INJURE A PARTY.—A Court of
review will not reverse the judgment of an inferior tribunal for errors committed
in excluding evidence, if the evidence excluded is contained in the record, and it
appears that the party complaining would not have been entitled to recover if the
evidence had all been admitted.

REVERSAL OF ORDER GRANTING NEW TRIAL.—If in the course of a trial a portion
of plaintiff's evidence is excluded by the Court, and a nonsuit is granted and judg-
ment rendered for defendant, and an order afterwards made granting a new trial,
from which defendant appeals, and the record contains the evidence excluded, and
the Court of review comes to the conclusion that if the evidence excluded had been
admitted, plaintiff could not have recovered, the order granting a new trial will be
reversed.

A DEED RECITING·A SALE IMPLIES A PRICE PAID.—A deed which recites that the
grantor has sold to the grantee the premises therein described, implies a price paid
as a consideration for the transfer of the property.

DEED UNDER LAW OF MEXICO.—The Mexican law of 1844 and 1845 did not inval-
idate a deed because not executed in the presence of and witnessed by a Notary
Public.

DEED BY LAW OF MEXICO NEED NOT STATE PRICE PAID.—A deed executed in Cal-
ifornia while it was a part of Mexico, was not void or invalid because no conside-
ration or price paid for the property described was expressed therein.

PRICE PAID FOR LAND PROVED BY PAROL. — If a deed does not express upon its

face the fact that a price was agreed upon and paid for the property conveyed, the true consideration may be proved by parol.

DEED OF LAND TO ALIEN UNDER LAW OF MEXICO. — Previous to the cession of California by Mexico to the United States, a citizen of Mexico might convey land to an alien by deed, and the grantor thereby became divested of his title, and the alien'grantee acquired a defeasible estate therein, which he retained, unless deprived of it by the proceeding of denouncement, or by the sovereign authority.

PURCHASE BY ALIEN UNDER COMMON LAW. — By the common law an alien born might purchase land, and the title remained in him until office found.

APPEAL from the District Court, Fourth Judicial District, City and County of San Francisco.

The Court below granted the new trial on the ground that it had erred in excluding the copies offered by the plaintiff from the books of record kept by the Alcalde.

The other facts are stated in the opinion of the Court.

*J. B. Crockett*, for Appellants.

In the case of *Havens* v. *Dale*, 18 Cal. 359, it is expressly held that a deed is good which expresses no consideration. The case of *Hayes* v. *Bona*, 7 Cal. 153, is the leading case in this State, in which it was intimated that, under the Mexican law, the consideration must be expressed. The same principle was recognized in *Stafford* v. *Lick*, 10 Cal. 12, and incidentally in *Stanley* v. *Green*, 12 Cal. 148. But in these cases the question was very little considered, and was apparently not very well understood by the bar of this State at that early period. The question was a new one in our Courts, and depended for its solution upon the laws of a foreign country, written in a foreign language with which neither the bar or bench were familiar. Since then the question has been more fully examined, and I think there can remain scarcely a doubt that under the Mexican law a deed was not void because it failed to specify the consideration. (*D'Orgenoy* v. *Droz*, 13 Louisiana, 387.)

No authority, I think, can be produced to establish that an alien could not hold land until it was denounced, or some other proceeding was had equivalent to an inquest of office found at common law. This is distinctly established in the

case of *The People* v. *Folsom*, 5 Cal. 373, and in *Ramirez* v. *Kent*, 2 Id. 558. In the former case the Court holds that an alien may not only hold lands, but may *inherit* them under the Mexican law. In an inheritance, the estate is cast by operation of law, whereas in a purchase, the party takes by his own act. If an alien may inherit, therefore it is difficult to see why he may not purchase. The law would not cast an estate upon him which he could not hold; and if he can hold it by inheritance, it cannot be against the law or its policy for him to hold by purchase.

The policy of the Mexican nation in respect to the acquisition of lands by foreigners is plainly apparent from the Colonization Law of August 18th, 1824, the first section of which promises security to foreigners in their persons and property; and the sixth, seventh, and eighth sections direct that no tax or duty shall be imposed on foreigners emigrating to the country, and that previous to 1840 Congress shall not prohibit the entry of foreigners to colonize; also that preference shall be given to Mexican citizens as colonists, but that land may be granted to foreigners. The Regulations of the 21st November, 1828, made to carry this law into effect, are even more explicit. The first section empowers the Governors of the provinces to grant lands to foreigners, in express terms —not only to individuals, but to *empressarios* who will contract to settle many families. These provisions not only authorize but were intended to encourage the acquisition of lands by foreigners; and this policy was never abandoned by the Mexican nation whilst it retained dominion in California.

The Supreme Court of the United States have in three several cases had before them the question of a grant of lands to foreigners under the Colonization Law. (See *United States* v. *Fremont*, 17 How.; *United States* v. *Reading*, 18 Id. 1; *United States* v. *Dalton*, 22 Id. 436.) Whilst the Court in these cases does not expressly decide the question, they intimate their views very clearly, and particularly in the case of Reading, to which I invite attention. From the intimation given in these cases it is quite evident how that Court would

decide in respect to a colonization grant to a foreigner. Indeed, it is difficult to see how they could decide otherwise under the Colonization Law of 1854 and the Regulations of 1828. If, then, foreigners could hold large bodies of land as colonists, with what grace can it be pretended that a foreigner was incapable of taking a town lot by purchase?

On the trial, the respondent cited and relied upon an Act of the Mexican Congress of March 12th, 1828, to be found in Schmidt's Civil Law, Appendix, No. VII.

The sixth section provides that foreigners shall be protected by the laws and have the same rights which are granted Mexicans, " with the exception that they cannot hold real estate, unless in conformity to the laws touching property held by persons not naturalized."

This proviso admits that, under the laws, persons not naturalized might acquire and hold lands in certain cases, but does not specify in what cases. The eighth section reaffirms the Colonization Law of August 18th, 1824; and the eleventh section provides that "property acquired by non-naturalized foreigners in fraud of this law may be denounced by any Mexican, *to whom it will be adjudged as soon as such fraud is proved*."

This section is a key to the whole law. It establishes that a sale to an unnaturalized foreigner in any case was not void, but only voidable on a denouncement. Under the Mexican system, a denouncement is equivalent to and a substitute for the inquest of office found at common law. In other words, it establishes beyond a doubt that foreigners could hold lands until the title was divested by the proper proceeding, to wit: by a denouncement. The only penalty fixed by law for its violation was that the lands became subject to denouncement. The title was not void, but only voidable.

It was wholly immaterial whether the documents were excluded or not. If they had been admitted on the trial, they would not have helped the plaintiff's case, and on another trial, it is submitted, would be wholly immaterial. The most important of the copies which were offered were

copies of the petition of Sanchez, the Alcalde's grant, the conveyance from Sanchez to El Moro, and the two conveyances from Hinckley to Paty. All these were admitted without objection; except the conveyance to El Moro. There was also offered a copy of a deed from Noe to Ross, and of a mortgage from Ross to Boggs. The exclusion of these three documents is the ground on which the new trial was granted. But if they had been all admitted, they would not have varied the case. Suppose it were conceded that Sanchez conveyed the lot to El Moro; that El Moro died, leaving a will, and appointing Escalante his executor; that Escalante, as executor, conveyed it to Noe, and that Noe conveyed to Hinckley; would this have helped the plaintiff? It would simply have proved the title in Hinckley; but the plaintiff proved that Hinckley had conveyed all his title to Paty, and put him in possession. What title was there, then, in Hinckley, to pass to his widow?

If, then, the Court erred in excluding these papers, the error was wholly immaterial, and would not have changed the result. It should not have granted a new trial, when it was evident the plaintiff had no case, even if these documents were in.

*Eugene B. Drake*, for Respondent.

The Court erred in permitting Paty to testify relative to the price or consideration that he paid Hinckley or Noe for the land in controversy, because there is no price recited in the deeds from Hinckley.

At common law it is necessary to allege price before proof *aliunde* will be permitted; the price, if not recited in the deed, is an *issuable fact*. (*Perry* v. *Price*, 1 Missou. 394; *Cheny* v. *Watkins*, 1 Harr. and John. 527; *Pacea* v. *Forwood*, 2 Harr. and McH. 175; *Stephens* v. *Griffith*, 3 Vermont, 488; 4 Kent's Com. 465.) And under the Mexican law, by which this case must be decided, proof *aliunde* cannot be admitted.

The written deed or contract must carry on its face and

contain within itself every material ingredient to support it. (2 Moreau's Partidas, p. 663, Law 6 ; 1 Domat's Civil L., p. 802, *n.* 2,022–2,025.)

The Court also erred in permitting Paty to testify relative to his transactions and agreements with Hinckley and Noe concerning his purchase of the lot. Such evidence only *enlarged, varied,* and *altered* the written contracts between Hinckley and Paty. In this action the legal title *only* is in issue, *and the party holding such legal title must prevail.* All evidence introduced by defendants, from the mouth of Paty, tending to show an equitable title in the defendants, should therefore have been excluded.

But, may it please your honors, we claim that the proof actually given and admitted on the trial of this cause, entitled the plaintiff to recover, and the Court erred in deciding that the plaintiff did *not* make a sufficient case for the jury.

From the testimony given, and now appearing in the agreed statement on motion for new trial, the jury (if they had been permitted by the Court) were bound to make a special finding of the following facts :

First—That Guillermo Hinckley was, on the 28th day of May, 1844, the legal and lawful owner, and in possession of the land in dispute, under a grant made by the Ayuntamiento of San Francisco, dated 8th November, 1837.

Second—That John Paty received the possession thereof from said Hinckley, and entered into possession under the writings from the latter to the former, dated respectively 28th May, 1844, and September, 1845.

Third—That Charles L. Ross received the possession thereof from said Paty, and that the defendants herein respectively received their possession from and entered therein under said Ross, and have remained in such possession ever since.

Fourth—That neither the defendants here, or the said Ross, or Paty, ever acquired any further or different right to the possession of said land, from said Hinckley, or his heirs, than is

specified and set forth in said writings, dated respectively 28th May, 1844, and September —, 1845.

Fifth—That said defendants did not prove the payment of any price to said Hinckley, or to his heirs, for the said land, or the payment of any price for the possession thereof, by said Paty, or Ross, or themselves, or either of them.

Sixth—That said Hinckley was a naturalized citizen of Mexico, and that he died on the 30th day of June, 1846, at the " Mission Dolores," leaving this plaintiff his widow, and that he left no other relatives in the Republic of Mexico, ascendant, descendant, or collateral.

Seventh—That said land is situated in the Pueblo of San Francisco, and within the boundaries of the Van Ness Ordinance.

If the foregoing facts correctly appear from the testimony, and we insist that they do, the plaintiff was *entitled to judgment.*

The only questions of law upon which there can be any discussion are : 1st—What effect can the Court give to the pretended deeds or writings executed between Hinckley and Paty, dated respectively May 28th, 1844, and September, 1845 ? And, 2d—As to the Statute of Limitations ?

As to the first question, we claim and expect to show that the pretended deeds from Hinckley to Paty are *void* for want of price. At common law the consideration of a bargain and sale deed must be of money, or money's worth. (Watk. Prin. Con. by Preston, 237 ; Bou. Dic. 158 ; 1 Cowen, 622 ; 4 Cowen, 427 ; 6 Paige's Ch. 526.) Consideration of blood or marriage must also be recited to sustain a covenant to stand seized.

We have already shown by the decisions in 1 Missouri, 394 ; 1 Harr. & John. 527 ; 2 Har. & McH. 175 ; 3 Vermont, 488 ; and 4 Kent Com. 465—that a deed without price is void, unless supported by an *allegation* of price in pleading, and followed by *proof* on the trial. In this case neither allegation of price or proof thereof appears.

But we suppose that the character of the deeds from Hinck-

ley to Paty must be determined by the rules of Mexican law, which was in force at the time they were executed. (*Hoen* v. *Simmons*, 1 Cal. 119; *Hayes* v. *Bona*, 7 Cal. 153; *Stafford* v. *Lick*, 10 Cal. 12; 1 How. U. S. 319; 2 How. U. S. 608; 9 Cal. 85.)

Under the Mexican law, sales of land must be made by writings, the deed or conveyance must be written on stamped paper, provided and sold by Government, and must recite the *description* of the land conveyed, the *price* paid, the *names* of the *grantee* and *grantor*, and the *date* of the transaction, and be executed in the presence of a Notary Public, or Alcalde, and before witnesses.

The deed must be by *Escritura Publica.* Escriche (Paris Ed. of 1852,) on page 1,529, word *Venta*, n. II, says: "If the property sold is real estate, it is necessary for the validity of the contract that the sale be made by a public writing." (Instrumento Publico.) And n. V, page 1,530, says: "Three things are necessary to sustain a contract of purchase and sale (*compra venta*) viz: The consent of the vendor and purchaser, a thing to be sold, and the price thereof." On same page, n. VIII, the law reads, the price must be *certain, just, and in money.*

The pretended deeds from Hinckley to Paty are entirely without price, either certain or uncertain, just or unjust, and therefore *void.* (*Hoen* v. *Simmons*, 1 Cal. 119; *Hayes* v. *Bona*, 7 Cal. 153; *Stafford* v. *Lick*, 10 Cal. 12.)

1 Domat's Civil Law, B. 1, Tit. 2, Sec. 3, n. 295, says: "The laws connive at the injustice of buyers, *except in the sale of lands where the price given for them is less than half their value.*"

Pothier, (on Oblig.) n. 33, 34, (by Evans,) also says: "*That injury is commonly deemed excessive which amounts to more than a moiety of the just price;* and the person who has suffered such an injury may, within ten years, obtain letters of rescission for annulling the contract."

If there is no price mentioned in the pretended deeds from Hinckley to Paty, how is it possible to ascertain whether Paty

paid Hinckley *more or less* than a moiety of the value of this land? There is absolutely nothing, in either the pretended deeds, or the pleadings of the defendants, or in the testimony of Paty, that gives us any light on the subject.

He who alleges a payment must prove it. (1 Domat's C. L. p. 896.) There must be *two* witnesses to make proof. (Id. p. 813.)

To avoid the uncertainty and impossibility of reaching the facts of such cases as this, the Mexican law wisely provides that all contracts of and for the sale of lands *must be in writing*, and that such writing *shall recite the price paid*.

The writing itself must contain the price, otherwise the transaction is a blank, and proof *aliunde* cannot be admitted. (2 Moreau's Partidas, p. 663, Law 6.)


By the Court, CURREY, J.

This is an action of ejectment brought for the recovery of a lot—No. 76, one hundred varas square—in the City of San Francisco. The defendants filed separate answers to the complaint, denying the plaintiff's alleged title, and setting up title in themselves, severally, to distinct portions of the premises, and also pleading the Statute of Limitations. The cause was tried before a jury, and on the trial the defendants, in compliance with a written notice from the plaintiff, produced certain original documents, as follows:

1st. A petition of Francisco Sanchez, bearing date November 8, 1837, addressed to the Ayuntamiento of San Francisco, asking for a grant to him of the lot in question.

2d. A grant, made in accordance with the petition, of the same date.

3d. An instrument in writing, purporting to be a deed of conveyance of the premises from Sanchez to one Jacinto El Moro, bearing date May 12, 1839.

4th. Two instruments in writing, purporting to be deeds of conveyance from William Hinckley to John Paty for the prem-

ises, one of which was dated in May, 1844, and the other in September, 1845.

The petition and grant were written on the same sheet of paper, and were admitted by the defendants to be genuine, and were then read by the plaintiff to the jury. On the back of the same sheet of paper was a writing purporting to be a conveyance of the premises from Sanchez to El Moro, bearing date May 12, 1839, which the plaintiff proposed to read in evidence without proof of its execution. To this the defendants objected, denying the genuineness of the instrument and protesting that they did not produce it under the notice, and insisting that as the subscribing witness thereto was living, the plaintiff was bound to prove its execution before it could be received in evidence. The Court sustained the objection and the plaintiff excepted.

The plaintiff then offered and read in evidence, without objection, two instruments in the Spanish language indorsed on the back of the petition and grant, which the defendants admitted to be genuine, of which the following are translations :

#### FIRST CONVEYANCE.

" I, the undersigned, having purchased the land before mentioned, and being the legal owner of said lot, this day have sold to Mr. John Paty two lots of fifty varas square, each one of said lots being east and west in the lot No. 76, on the plan of Yerba Buena, and for further testimony whereof I sign, this 28th day of May, 1844.

" GUILLERMO HINCKLEY.

" NATHAN SPEAR."

#### SECOND CONVEYANCE.

" I the undersigned, having sold to Mr. John Paty what is left in my possession of the lot granted in this document, I

renounce all right in said lot, delivering this document to said Paty, and signing in presence of the Alcalde of this place.

"YERBA BUENA, September —, 1845.

"GUILLERMO HINCKLEY.

"Witness:                          "Witness:

"FRANCISCO SANCHES.          G. H. NYE.

"In the absence of the Alcalde,

"ROBERT T. RIDLEY."

The plaintiff then produced from the County Recorder's office a book called Book A, of Original Grants, and proved it to be in the handwriting of Washington Bartlett, a former Alcalde of San Francisco, and that it was on file in said Recorder's office as a part of the records of the office, and also that it was kept and used in the office of the Alcalde as a book of records at the dates mentioned therein.  The plaintiff offered to read from this book copies of the petition and grant, the conveyance from Sanchez to El Moro, and the two conveyances from Hinckley to Paty; also, a certificate of Washington Bartlett, Alcalde, dated October 17, 1846, to the effect that by virtue of these documents John Paty declared himself to be the legitimate owner of a lot of one hundred varas square on the plan, numbered seventy-six, and that said lot was then fenced in, but had no house on it.

The defendants objected to reading these papers, on the ground that the same were secondary evidence, and on the further ground that there was no proof of the execution of the originals, and that said book was not a book of records entitled to be used in evidence, either as original or secondary evidence.  The Court sustained the objection, and the plaintiff excepted.

The plaintiff then offered in evidence a copy of a deed of conveyance and release of the lot in question from José de Jesus Noe to Charles L. Ross, bearing date December 8, 1847, in which it was recited that the lot described was transferred "by Gregorio Escalante, administrator of Jacinto El Moro," to said Noe, and by said Noe to William Hinckley.  The plain-

59

tiff also offered in evidence a copy of a mortgage of a portion of the same lot, executed by Charles L. Ross to L. W. Boggs, dated November 22, 1848, describing the premises as the lot of ground originally granted to Francisco Sanchez. In connection with the offer in evidence of this deed and mortgage, it was proved that the same were recorded, the one in Liber A and the other in Liber C, kept in the office of the Alcalde of San Francisco, at their respective dates. To admitting these copies in evidence the defendants objected, on the ground that the execution of the originals, of which the record purported to contain copies, was not proved. The Court sustained the objection, and the plaintiff excepted.

The plaintiff then gave in evidence a deed from John Paty to Charles L. Ross, bearing date the 8th of December, 1847, conveying to him all the grantor's right, title and interest therein, for the consideration of one thousand and fifty dollars. It was admitted by stipulation of the parties that all the defendants entered originally under conveyance from Ross, and at the time of the trial held whatever title Ross acquired in the premises.

Other evidence was produced by the plaintiff, showing that William Hinckley was the husband of the plaintiff at the time of his death, in June, 1846 ; that he was, at the time of his marriage in 1842, and also when it is claimed the lot in question was conveyed to him, a naturalized citizen of the Republic of Mexico ; and also evidence was given to the effect that the plaintiff was his only heir at law at the time of his death. It was also proved by John Paty, who was called as a witness for plaintiff, that he was the person to whom Hinckley executed the instruments in writing, the one dated in May, 1844, and the other in September, 1845 ; that he was a native of the United States of America and never was a naturalized citizen of the Mexican Republic, nor the husband of a Mexican woman ; and also that he never had a license or permission from the Mexican Congress to acquire or hold land in California. Paty also testified that, at the dates of these instruments, he obtained possession of the property therein described, and

held the same in possession until he sold and conveyed to Ross. That when he purchased the lot Hinckley was indebted to him, and that by an arrangement between them the witness paid a consideration for the property, in part by the discharge of the debt due him from Hinckley and in part by the payment of a debt due from Hinckley to Noe, as the consideration for the lot on the sale thereof by Noe to him.

When the plaintiff had closed his evidence the defendants moved the Court to grant an order nonsuiting the plaintiff, on the ground that a case had not been established by the evidence, proper or sufficient to be submitted to the jury. The Court granted the motion and the plaintiff excepted. Judgment was then rendered in favor of the defendants. Subsequently, on the application of the plaintiff, the nonsuit was set aside and a new trial granted, and from this order the defendants have appealed.

It is not necessary to determine whether the Court was right or wrong in excluding the instruments purporting to be deeds and copies of deeds, provided we come to the conclusion that if the same had been received in evidence the plaintiff would not have been entitled to recover, for it is not a matter of course that a Court of review must reverse a judgment of an inferior tribunal for errors committed except for those by which the complaining party may have been injured. (*Comstock* v. *Smith*, 23 Maine, 210 ; *Bohr* v. *Steamboat Baton Rouge*, 7 Sme. & Marsh, 723 ; *Crease* v. *Barrett*, 1 C. M. and R. 932 ; *Brazier* v. *Clapp*, 5 Mass. 10 ; *Hoyt* v. *Dimon*, 5 Day, 484 ; *Johnson* v. *Blackman*, 11 Conn. 358 ; *Lively* v. *Ball*, 2 B. Mon. 54.)

There is no controversy between the parties in respect to the validity of the grant to Sanchez, and as the case stands upon the documentary and parol evidence offered on the part of the plaintiff and appearing in the record, some portions of which were admitted and others excluded, we may consider the case upon the hypothesis that all such evidence is before us, and that at the date of the instruments purporting to be conveyances executed by William Hinckley to John Paty the title to the premises was in Hinckley, and that he is the com-

mon source from which the respective parties derive whatever right and title they or any of them may have in the premises.

In this position of the case two questions arise :

First—Were the instruments in writing executed by Hinckley to Paty valid and operative as conveyances in fact, or invalid and void because no consideration or price paid for the property described was expressed therein, or for the reason that they were not executed in the mode required by the law?

Second—Was John Paty, the grantee named in such instruments purporting to be conveyances, for the reason he was not a citizen of the Mexican Republic, but an alien, incapable of taking, by grant, the land intended to be conveyed to him, and of holding the same?

I. In the consideration of the first question here propounded, it is proper to ascertain from the instruments executed by Hinckley, which the defendants claim were conveyances of his right, title and interest in the premises, the intention of the parties. In the first of these instruments Hinckley declares : " I the undersigned, having purchased the land before mentioned, and being the legal owner of said lot, this day have sold to Mr. John Paty two lots," describing the same as a portion of the lot before mentioned ; and in the second of said instruments he recites having sold the remainder of the premises to the said Paty, and then renounces all his right in the lot, delivering to his grantee the document which he then signed in the presence of witnesses. It requires neither argument nor illustration to ascertain what Hinckley meant by the use of the language employed. In both instruments he declared in terms that he had sold to John Paty portions of the premises, which of itself implies a price paid as a consideration for the transfer of the property ; added to which Paty testified on the trial that he paid a pecuniary consideration for the premises, which we must deem adequate in the absence of evidence to the contrary, provided the instruments intended to be deeds of conveyance are not to be pronounced invalid, for the reason that the price was not expressed therein, or for other cause.

It is earnestly insisted on the part of the plaintiff that these

instruments should be held void, because it does not appear upon their face that a just price was paid by the vendee for the premises; and it is also insisted that the omission to state therein that a price was paid for the property cannot be supplied by proof of the fact *dehors* the documents themselves, and the Partidas, and Domat's Civil Law are cited in support of these positions. But these authorities do not lay down the doctrine for which they seem to have been invoked. (Partida 5, Tit. 5, Law 6; 1 Domat, Book 3, Tit. 6, Secs. 4–6.) According to the Partidas, sales and purchases might be effected in two ways: the one by writing, the other without. If the purchaser desired the contract to be reduced to writing, and that mode of evidencing the transaction was agreed upon, a sale thus made was not perfect, although the parties were agreed upon the price, until the writing was made and executed, for until then either party might retract. In the summary prefixed to Law 9, Title 5, of the Fifth Partida, it is said that " the price shall be expressed with certainty in the sale." If this is to be understood to the effect that the price must be expressed in the writing executed, then, by reference to the body of the law itself, it will be found to contain no such requirement. (*Walker* v. *Fort*, 3 La. 538; *Holmes* v. *Patterson*, 5 Martin, 693; Pothier on Sales, Part 1, Art. 2, Sec. 2.)

In *Hayes* v. *Bona*, 7 Cal. 158, the Court gave countenance to the doctrine that a contract for the sale and transfer of land, under the law existing in California at the time when the conveyances from Hinckley to Paty were executed, must contain the names of the parties, the thing sold, the date of the transfer and the price paid; and subsequently, in *Stafford* v. *Lick*, 10 Cal. 16, the same Court repeated the rule suggested in *Hayes* v. *Bona* as the settled law; and in *Stanley* v. *Green*, 12 Cal. 166, it was held that "any instrument in writing which contained the names of the parties, a designation or description of the property sold, the date of the transfer and the price paid was sufficient to pass the title." That an instrument containing all the characteristics thus designated was sufficient as a deed of conveyance may be and is admitted, but it does

not therefore follow that the omission of the date, or the failure to mention the price, would render a deed designed as a conveyance inoperative and void. Any one who comprehends the nature of a contract of sale evidenced by writing will readily perceive that the writing, in order to constitute the contract or evidence of the contract, must show who are the contracting parties and the subject matter transferred. These constituent parts of a written contract of sale are essential to it as a contract, and are therefore indispensable, but it is not so in respect to the mention of the date or of the price paid as the condition of the transfer.

In *Havens* v. *Dale*, 18 Cal. 366, the Court refused to follow *Hayes* v. *Bona*, saying that they could not see anything in the point that the deed in question in that case was void by the Mexican law, because it did not recite the price or consideration.

The Court makes no reference, in *Hayes* v. *Bona*, to any law or authority requiring the price paid to be mentioned in the contract, unless it be to Law 29, Book 8, Title 13, of the *Recopilacion de Indias*. We have examined the law referred to, and find nothing in it requiring a written contract of sale to specify the price paid by the purchaser. This law providing for the execution of contracts in the presence of a certain officer had relation to the public revenue. The law made it the duty of the officer in whose presence contracts were executed to furnish once a month, to another of superior grade, a copy of every contract of sale made in his presence during the preceding month, with a statement specifying the day, the month and year when executed; the names of the vendor and vendee; a designation of the property sold or exchanged, and the price paid or the thing exchanged for it. This is the sum and substance of the requisition of this law, which comes entirely short of requiring that the price paid should be expressed in the deed of conveyance.

In the second volume of the " *Nuevo Febrero Mejicano*," at page 702, (Ed. of 1851) it is said : "In order to make a contract of sale valid, the following conditions are necessary :

*First*—A legal ability in the contracting parties and their free consent; *Second*—A thing certain and determinate; *Third*— A fixed determinate price—for if any one of these three conditions be wanting there will be no contract of sale." In Volume 1, Title 26, Chapter 3, of the same work, the author says, "when the deed of sale is simply of property, it ought to recite who sells, and to whom; the nature and condition of the vendor; a designation of the thing sold; whether it be movable or immovable property; whether it be free or incumbered, and where situated; and if it be land, its extent and quantity." This author goes into a minute specification of the particulars which the deed ought to recite; for instance, if the subject of sale be a vineyard or olive orchard, he says the deed ought to set forth the number of vines or olive trees therein, and also how many it can contain. If it be a house, then of what material it is built, and the style of its front and foundation, and the number of superficial feet it covers, etc. And in cases of sales of merchandise, he says the goods should be minutely described, with an enumeration of the pieces or weight, according to the proper mode of measurement, with the prices of the articles. It is said the *escribano* should be very careful in this respect, for though the omission to observe these directions may not anul the instrument of sale, fraud may be presumed, and the Judge can impose on him an arbitrary penalty for not having complied with the requirements of the law, besides compelling him to make good the damage which may have been caused to any one of the contracting parties. Another clause of the same law is to the effect that the writing should contain a declaration of the vendor that the price at which the sale is made is the just and true value of the thing sold, and for that reason there is neither *lesion* nor fraud; and then it is said, " and in case the thing have a greater value, in order that he may have no cause of action to make a demand for the excess, let the seller make to the purchaser a donation thereof, perfect and irrecoverable, and a renunciation of the same, as he is authorized to do by Law 2, Title 1, Liber 10, of the *Nueva Recopilacion*." The law here referred to required

that if the vendor of a thing declare that he was deceived to the extent of more than one half the just price thereof, the purchaser should be required to make up to him the deficiency in the just price of the thing at the time he received it. If the buyer made the like declaration, then the vendor was required to restore to the purchaser what was in excess of a just price, or receive back the property sold, returning to the purchaser at the same time what he had already received for it. This rule, it is declared, should be observed in sales and exchanges and other contracts of like nature; and it is also declared that this law shall be effective in all such contracts from the day they are executed for the term of four years, and no longer.

Thus it appears that either of the parties may have his remedy for an injury of the nature described (provided he does not renounce his right to it, under the law), in the mode prescribed, at any time within four years; after which he is barred by the limitation specified; but the same law provides that the contract shall not be annulled by the omission of this requirement.

We have been referred to the work of Sala, which is admitted to be of high authority. In Volume 2, Title 16, Section 5, Article 22 of this work, generally entitled " Sala Mejicano," it is said : " The certainty of the price ought to appear (*debe aparecer*) from the tenor itself of the contract or by some other thing or certain person expressly therein mentioned." And then to illustrate what is meant by the reference to some other thing or person for ascertaining the price, this author says : " The sale of a house, for instance, would be valid when sold for all the money there may be in the chest; for what it cost; for whatever may be appraised by some person agreed upon, and even for whatever may be a fair price." Sala does not say the price must be mentioned in the instrument of sale. He says it ought to appear from the tenor of the contract or by reference therein to some other thing or some particular person. We do not understand the words *debe aparecer*, to be used in the imperative sense of

must appear. It seems from this learned commentary that the sale would be valid if it appeared that the price agreed upon was "whatever may be a fair price;" thus leaving the amount of the price to be ascertained by evidence *dehors* the deed of sale.

The word "sold," as used in the instruments executed by Hinckley to Paty, implies, as we have said, a price or consideration. paid or contracted to be paid for the property transferred; and after a period of more than eighteen years since these transactions, we would not be justified in presuming that such price was not just and of the value of the property at that time.

It should be observed that the Spanish and Mexican authors to which we have referred do not say that a contract of sale which omits to set forth the many subordinate matters mentioned, shall be void because of such omission. While certain things are of the essence of a contract, others are not; and though it is said that such subordinate things ought to appear by the contract itself when in writing, it is obvious from the whole tenor of authorities that the object of such stipulations was the protection of the one or the other of the parties from consequences that otherwise might ensue to his prejudice. In these respects it is evident that these provisions of the laws were directory merely; and that contracts were not void because of a failure to observe such directions.

Another question touching the validity of the conveyances from Hinckley to Paty to the effect that they were not executed in the presence of a proper officer and authenticated by him as it is maintained the law required, is suggested.

Failing to appear before an *escribano* or Notary Public, that he might witness the execution of a contract did not, so far as we are able to learn, render the transaction void; on the contrary, contracts in writing entered into without the presence of the officer, were held valid, as sufficiently appears by Law 1, Title 1, Liber 10, of the *Novissima Recopilacion*, which is also to be found at pages three hundred and sixty-one and three hundred and sixty-two of the second volume of Rodriquez's

General Code of Laws, published in Mexico in 1840, entitled *Pandectos Hispano Mejicanas.* This law relates to contracts and obligations in general, and translated reads as follows: "If it appear that one has undertaken to bind himself to another by promise or by contract or in other manner, he shall be required to perform his obligation; he shall not be allowed to object that no stipulation was made; that is, that the promise was not made with certain legal solemnities, or that the contract or obligation was made between persons absent, or that it was not made before an *escribano publico,* or that it was made by one private person in the name of others who were absent; or that one person contracted that another should do or give something; we decree, nevertheless, that all obligations and contracts so made, shall be valid in whatever way it may appear that one may have bound himself to another."

This law, as we are advised from reliable sources, was the law of the land at the time Hinckley executed the instruments set forth, and we are of the opinion that it was not indispensable to the validity of such conveyances that they should have been executed in the presence of an officer.

It appears from the evidence that a price certain was agreed upon by the parties at the time the transfers were undertaken to be made, but that the same was not expressed in the instruments executed. To this it is objected that evidence *aliunde* cannot be received to establish the fact that a price was agreed upon and paid. This objection is not tenable. Such evidence neither contradicts nor varies the deeds. The rule has become general that where no consideration is expressed in a deed of conveyance of land, the true consideration may be proved by parol: (*Peacock* v. *Monk,* 1 Vesey, 127; *Jackson* v. *Fish,* 10 John. 456; *Frink* v. *Green,* 5 Barb. 455; *Barnes* v. *Perine,* 15 Barb. S. C. 249; 2 Kern. 18.)

II. At the time when the conveyances were executed by Hinckley, in 1844 and 1845, his grantee, Paty, was not a citizen of the Mexican Republic, nor the husband of a Mexican woman, and it is therefore objected on the part of the plaintiff,

as before stated, that he was not competent to take and hold real property in California, by grant.

By the law passed by the Mexican Congress, on the 18th of August, 1824, respecting colonization, foreigners were invited to acquire and settle upon the vacant lands of the republic, and the nation promised to those who might come to establish themselves in its territories, security in their persons and property, provided they subjected themselves to the laws of the country. The same law provided that, previous to the year 1840, the entry of foreigners to colonize should not be prohibited, except with respect to the individuals of some nations, it should become necessary; and it was also provided that in the distribution of lands Mexican citizens should be preferred to foreigners. The regulations for the colonization of the territories of the republic, passed on the 21st of November, 1828, authorized the Governors, in compliance with the law of the 18th of August, 1824, and under the conditions therein specified, " to grant vacant lands in their respective territories to such contractors (*empresarios,*) families or private persons, whether Mexicans or foreigners, who may ask for them for the purpose of cultivating and inhabiting them."

The proceeding which the Mexican was required to adopt in order to acquire lands from the Government seems to have been the same as that demanded of the foreigner, so far as appears from the law of 1824 and the regulations of 1828. The only discrimination which the law of 1824 made between the Mexican citizen and a foreigner, was that the former should be preferred to the latter in the distribution of the public domain. It seems to have been the policy of Mexico to encourage the acquisition by foreigners of permanent interests in its territories, though by laws and decrees subsequent to the law of 1824 and the regulations of 1828, the acquisition of lands in the frontier departments by foreigners was limited to those of countries whose territory was not contiguous to that belonging to the Mexican Nation.

By the edict of Santa Anna, signed on the 11th and ordered to be published on the 14th of March, 1842, it was decreed

that foreigners not citizens in the republic might acquire and hold lands by purchase, adjudication and denouncement, or any other title established by the laws, except in the departments of the frontiers and bordering on other nations, in regard to which it was declared special laws of colonization would be enacted, " without the power to foreigners to ever acquire property in them, without the express license of the Supreme Government."

Upon the authority of this edict or decree, it has been supposed by some that a transfer of real property, by one capable of granting, to an alien, was *ipso facto* void; but we do not understand such to be its effect in relation to a private grant. The declaration that in regard to the departments of the frontier and bordering on other nations special laws of colonization would be enacted is indicative, if not demonstrative, of the subject matter to which the edict applied; and this view of the subject is fortified by reference to a subsequent portion of the same decree, wherein it is declared that "foreigners cannot acquire royal or public lands in all the departments of the republic without contracting for them with the Government, which possesses the right as representing the domain of the Mexican Nation." By this it appears again that this law or decree of 1842 had reference to the acquisition by foreigners of the public lands; and was designed as a limitation to a prescribed mode, by which an alien could acquire lands of the public domain within the interior departments of the republic. If our understanding and construction of this law be correct, then the capacity of an alien to acquire and hold land by grant from a private source must depend upon other laws, relating particularly thereto.

In 1828 the Mexican Congress passed an Act in relation to passports, and the mode of acquiring property by foreigners. The former portion of this Act specified by what means foreigners might lawfully enter and pass through Mexican territory, and further provided what those who had entered the country before then must do to avoid the prescribed penalties for neglecting its prospective requirements, and then it is

enacted that "foreigners who have entered and established themselves according to the preceding rules, or to those which may hereafter be prescribed, are protected by the laws, and have the same civil rights which are granted to Mexicans, with the exception that they cannot hold rural real property (*propiedad territorial rustica*), unless in conformity to the laws touching property held by persons not naturalized." Thus it appears that a foreigner might acquire and hold real property subject to the laws having reference to his condition and character as an alien. These laws were to be observed, but not, it would seem, as a condition precedent to the alien's capacity to acquire property in lands, because in a subsequent section of the same law it is declared that "Property acquired by non-naturalized foreigners in fraud of this law may be denounced by any Mexican, to whom it will be adjudged as soon as such fraud is proved." (Schmidt's Civil Law of Spain and Mexico, 346.)

When the edict of Santa Anna, to which we have referred, is considered in the light of the law of 1828, and of the general law relating to the subject of denouncement, we cannot regard a conveyance of land by a private citizen to an alien as void; but, rather, that the grantor in such case would be divested of the property which he had undertaken to convey, and at the same time the alien grantee would become invested with a defeasible estate therein, of which he might be deprived by the sovereign authority, or by a citizen of the republic by the inquisition of denouncement.

A denouncement was a judicial proceeding, and though real property might be acquired by an alien in fraud of the law— that is, without observing its requirements—he nevertheless retained his right and title to it, liable to be deprived of it by the proper proceeding of denouncement, which in its substantive characteristics was equivalent to the inquest of office found, at common law. (Escriche, "Denuncia;" *Ramirez* v. *Kent*, 2 Cal. 558; *People* v. *Folsom*, 5 Cal. 378; *Craig* v. *Leslie*, 3 Wheat. 563; *Bradstreet* v. *Supervisors of Oneida Co.* 13 Wend. 546.)

At common law an alien born might purchase lands, but not for his own use, for thereupon the King became entitled to them. (1 Black. Com. 372.) A conveyance of land to an alien was a cause of forfeiture to the Crown of such lands, not only on account of the alien's incapacity to hold them, but likewise on account of his presumption in attempting by an act of his own to acquire real property. (2 Black. Com. 274.) But notwithstanding, until office found, the title remained in him. (1 Com. Dig., Title Alien, C. 2.)

So far as we are advised, the consequences that might follow this species of infraction of the law was substantially the same under the Mexican law as at common law, and until denouncement, the alien grantee of land could hold and possess it as his own property.

In argument the plaintiff's counsel admits that if Paty had received a good and valid deed from Hinckley, sufficient in law to convey the title in fee, that though an alien he could have held such estate until divested of his right by denouncement. Then, if Paty, being an alien, acquired the property in controversy in fraud or contravention of the law (which is not to be presumed in the absence of evidence to that effect), he held it at the time of his conveyance to Ross; for it is not proved, nor is it pretended that any proceeding was ever instituted by a Mexican or on the part of the Government to divest him of his title, and it is now too late to question his right on account of his having failed to observe the requirements of the law, even if it could be proved that such was the case.

We have examined and considered this case, with the evidence on which the plaintiff relies for a recovery and which she proposed to introduce to the Court and jury, before us, and are of the opinion that it would not authorize a verdict and judgment in her favor; it therefore follows that the order setting aside the nonsuit, and the judgment thereupon given and the granting of a new trial should be reversed, and it is accordingly so ordered.

Mr. Justice SHAFTER expressed no opinion.