# CASES ARGUED AND DETERMINED

IN

# THE SUPREME COURT,

## OCTOBER TERM, 1855.

THE PEOPLE *ex rel.* THE ATTORNEY-GENERAL, Appellants, *v.* JOSEPH L. FOLSOM, Respondent.

The Federal Government has not only the right of eminent domain, but the fee, and the prime and uncontrolled right of disposition of the territory, all of which are attributes of sovereignty.

The Territory of California passed to the United States. subject to the power of the Federal Government to establish a Territorial Government, or erect the same into a State. It was garrisoned and held by United States troops and governed by United States officers. Every acre of land not the property of Mexican citizens passed to it, and the power of the Federal Government to acquire territory, either by purchase or treaty, is undisputed.

Sovereignty can never be in abeyance, and until there was some local government organized. either by the people of the territory, or some other competent authority, the United States, upon the doctrine of necessity, succeeded to, and represented the Government of Mexico, so far as the same could be exercised within the purview of the Constitution.

The United States, after the treaty of Guadalupe Hidalgo, did not become vested with authority to prosecute any claim for a forfeiture or escheat that had accrued in California to the Mexican Government.

An alien may hold real estate against every one, and even against the Government, until office found.

The People, etc., Appellants, v. Joseph L. Folsom, Respondent.

Laws regulating the admission of foreigners and aliens, and placing them under peculiar disabilities, and especially those relative to escheats, are political in their character.

The policy of the Government of the United States has been to encourage the immigration of foreigners, and to this extent a system of pre-emption has been adopted in all the Territories and new States, in which there is no discrimination between foreigners and native citizens.

Foreigners can hold property in all the Territories, and may inherit, in the absence of legislation upon this subject.

By the civil law, as well as the common law, the King cannot take upon himself the possession of an estate said to have escheated, until the fact is judicially ascertained by a proceeding in the nature of an inquest of office.

The Mexican law of escheats did not remain in force in California until the ratification of the treaty of Guadalupe Hidalgo.

This law was abrogated by the conquest of the country by the Americans, as far as citizens of the United States and aliens were affected.

Twelve days before the ratification of the treaty of Guadalupe Hidalgo, Leidesdorff, a naturalized citizen of Mexico, died, seized of certain lands in San Francisco, and Anna M. Sparks, his mother and heir, through whom the defendant claims title, was not at the time of his death a citizen of the United States or of Mexico, but was a subject of Denmark, and never resided in Mexico or the United States. *Held*, that in order that the United States should take any interest in the land, it was necessary that the forfeiture should have been ascertained, either by the United States or by Mexico.

On the death of Leidesdorff, his mother, by the rule of natural justice, became entitled to the possession of the land, and could not be disturbed until office found.

There having been no inquest of office under the Mexican laws, Anna M. Sparks held the land, until the change of Government, and no disability existing under the laws and Constitution of the United States, and no means being provided for instituting this proceeding or declaring a forfeiture, she became vested with the absolute title, which cannot now be disturbed.

There is no common law of the United States as contradistinguished from the individual States; and the Courts of the United States. instead of administering the common law or any particular system, conform to the law of the States where they are situated.

APPEAL from the District Court of the Fourth Judicial District, San Francisco County.

The facts material to the points decided appear in the opinion of the Court.

*J. R. McConnell,* Attorney-General, for Appellants.

*Halleck, Peachy, Billings & Park,* for Respondent.

No briefs on file.

Murray, C. J., delivered the opinion of the Court. Heydenfeldt, J., concurred.

This case has excited more public attention than any that has heretofore been presented to this Court, both on account of the amount and the principles involved.

Its discussion has evinced a research and ability highly complimentary to the counsel engaged, without which it would have been almost impossible to arrive at a satisfactory conclusion.

The case stands thus: On the 18th of May 1848, Leidesdorff, a naturalized citizen of Mexico, died seized of the property in dispute, and that Anna Maria Sparks, his mother and heir, through whom defendant's claim, was not at the time of his death a citizen of Mexico or the United States, but was, and is now, a subject of Denmark, and has never resided in the United States or Mexico. It will be observed that Leidesdorff's death occurred twelve days before the ratification of the treaty of Guadalupe Hidalgo.

The questions presenting themselves upon this state of facts are, first—was Anna Maria Sparks competent, under the laws, as they then existed, to take the property of Leidesdorff by inheritance ? And second—if she was not, has the State of California such an interest in the estate as can be maintained in this proceeding ?

The first proposition, so far as it relates to the question of the disabilities of aliens, and their right to succeed by inheritance to real estate in Mexico, involves the examination of many doubtful and con_ flicting authorities, more valuable to the student and the professional antiquarian, as relics of a by-gone jurisprudence, with which the present day is but little acquainted, than necessary to this decision, which must turn on a different point.

The disability of aliens to take by inheritance is a familiar principle of the common and the civil law. This disability at common law is said to arise from the fact, that an interest in the soil requires a permanent allegiance to the King or the Lord of the Manor, which would probably

be inconsistent with that which the alien owes to his natural liege. Bacon's Abridg. Title A.

In the quaint language of Lord Coke, it is said, that an alien cannot inherit, because, among other reasons, "the sinews of war and the armament of peace would be taken and enjoyed by strangers born," and because he has no heritable blood. Calvin's case, 4 Coke and 2 Black., 249. The rule of the civil law was founded on like reasons. This policy is said to have been adopted by the Romans from the Athenians, who excluded foreigners from a participation in their civil rights.

Among them it was a maxim of jurisprudence as well as politics, that an alien could take and enjoy nothing except by express legislation, they regarding aliens and enemies as synonymous. This feeling of jealousy and illiberality is said to have arisen in some degree out of the personal privileges enjoyed by the citizens of the Grecian cities, and by the Romans, the participation or benefit of which they were unwilling to extend to strangers.

The subversion of the Roman empire led to the establishment of the Feudal system in Europe. The northern barbarians, who overran almost the whole continent, rewarded their followers by dividing the conquered people and their land among them, on condition of military allegiance and service. "Landed property was thus erected into a political benefice, though bestowed in general, as a reward for services rendered to the donor. Its profits and advantages were still considered as the wages of an office, for the due performance of which allegiance was indispensably requisite." From this it follows, that no one could hold land unless he could perform these duties, and therefore aliens were forbidden from acquiring land by purchase or inheritance. This system was adopted in almost every country on the continent of Europe, with the exception of Spain, where it never prevailed to any extent, and in which the right of primogeniture did not exist, and the title to lands was allodial, and not held by military service or tenure. What the exact law of Spain upon the subject was, and how far these disabilities have been increased, or removed by Mexican legislation is difficult to say. In the case of Philips *v.* Rogers, 5 Martin's La , 679, it was held, that aliens could inherit land in Louisiana. In that case, the opinion proceeded on the ground that the acquisition of property by inheritance

invested the person with a qualified citizenship; or in other words, that inheritance was one of the modes of naturalization known to the laws. This decision was afterward reviewed by the Supreme Court of Texas, (in the case of The Heirs of Holliman v. Peeble, 1 Texas, 673,) and a different conclusion arrived at. Which was correct, is unnecessary to determine; for admitting that Anna Maria Sparks could not take by inheritance, under the laws of Mexico, as they existed at the death of Leidesdorff, by what right can the State of California now assert a claim to this property?

I do not consider it a matter of importance, whether the sovereignty of the United States commenced over the State of California from the date of the ratification of the treaty, or from the time of hoisting the flag of the United States at Monterey, and maintaining an armed occupation of the country;—in other words, whether we regard California as a ceded, or a conquered country.

The argument of the Attorney-General proceeds on the ground that a forfeiture having accrued to the Mexican Government, the land passed to the Federal Government of the United States, which, being unable to take, for want of inherent sovereignty, held the same in trust, until there should be a sovereignty competent to take, and that the State of California is now entitled to assert her right to it.

This argument assumes, First—that there has been an actual forfeiture; Second—that the Federal Government possesses no sovereignty in the territories; and, Third—that the body of the common law was extended over the territory by its acquisition.

I shall not venture upon the much vexed political question, of the power of Congress to legislate for the territories; for I deem it unnecessary. But the Federal Government has not only the right of eminent domain, but the fee, and the prime and uncontrolled right of disposition of the territory, all of which are attributes of sovereignty. The Territory of California passed to the United States, subject to the power of the Federal Government to establish a Territorial Government, or erect the same into a State. It was garrisoned and held by United States troops, and governed by United States officers; every acre of land, not the property of Mexican citizens, passed to it; and the capacity of the Federal Government to acquire territory

48

either by purchase or treaty, will not be disputed at this day. Thus far, then, there existed a limited sovereignty. To what extent it might be exercised over the domestic or political rights of the inhabitants of the territory, consistent with the spirit of the Federal compact, it is not necessary to say. Sovereignty can never be in abeyance, and until there was some local government organized, either by the people of the territory, or some other competent authority, the United States, upon the doctrine of necessity, succeeded to, and represented the Government of Mexico, so far as the same could be exercised within the purview of the Constitution. In order, therefore, that the United States should take any interest in the land in question, it was necessary that the forfeiture should have been ascertained, either by her or Mexico.

By the civil law as well as the common law, the King cannot take upon himself the possession of an estate, said to have escheated, until the fact is judicially ascertained by a proceeding in the nature of an inquest of office; and in this, there is a difference from the case of a forfeiture, for want of the performance of conditions precedent; for in the latter, the conditions never having been performed, the title has not vested. An alien may hold real estate against every one, and even against the Government, until office found. 3 Black., 259. 13 Wendell, 546. 3 Wheaton, 563. Escreche, Partidos Hispano Mexicanos, Vol. 2, 696. Sala Mexicano, Vol. 2, 240. Ramirez v. Kent, Bartell & Co., 2 Cal., 559. So that on the death of Leidesdorff, his mother by the rule of natural justice, became entitled to the possession, and could not be disturbed until office found. No such judicial proceeding was instituted, and no act of the Mexican Government was done to divest her defeasible estate. While things remained in this condition, the treaty was ratified, and California became a territory of the United States. With the change of flags, there was a change of political laws.

It now remains to be seen, whether this was a political law or not. The authorities that I have cited, as well as the ordinances and decrees of Mexico, cited by the Attorney-General, leave no room to doubt this. If laws regulating the admission of foreigners and aliens, and placing them under peculiar disabilities, on account of some supposed inconvenience which may result to the State, are not political, it would

be difficult to find any law that was. Now there is no common law of the United States, as contra-distinguished from the individual State s and the Courts of the United States, instead of administering the common law, or any particular system, conform to the law of the States where they are situated; so that the acquisition of California did not extend over it the common law, which recognizes and sustains the doctrine of escheats; for in that case, there would have been a continuation of the same political law. But in the absence of any law on the subject, the principles of the natural law would prevail, as well as the familiar principle of jurisprudence, that any one may inherit who is not expressly prohibited.

The policy of the Government of the United States, has been to encourage the immigration of foreigners; and to this extent, a system of pre-emption has been adopted in all the territories, and new States, in which there is no discrimination between foreigners and native citizens. Foreigners can hold property in all the territories, and may inherit, in the absence of legislation upon this subject. I have treated this question thus far, as if the Mexican law of escheats remained in force until the ratification of the treaty. In the case of Fremont v. The United States, Judge Taney, noticing the objections to Fremont's claims, which were, First—that Alvarado's alienation to Fremont was a breach of the condition against alienation; and, Second—that Fremont was an alien, and could not acquire landed property,—says: "But if this condition was valid by the laws of Mexico, and if any conveyance made by Alvarado could have forfeited the land under the Mexican Government as a breach of this condition, or if it would have been forfeited by a conveyance to an alien, it does not by any means follow, that the same penalty would be incurred by the conveyance to Fremont. California was at that time in possession of the American forces, and held by the United States as a conquered country, subject to the authority of the American Government. The Mexican municipal laws which were then administered, were administered under the authority of the United States, and might be repealed or abrogated at their pleasure, and any Mexican law inconsistent with rights of the United States or its public policy, or with the rights of its citizens,

were annulled by the conquest." So that it makes no difference whether the law of escheats be considered a political or municipal law.

If, then, the laws of Mexico were abrogated so far as a citizen of the United States was concerned, why not so far as an alien ?—for, I again ask, what is there in the Constitution and laws of the United States, that will warrant any distinction ? And if Fremont, an alien to the Government of Mexico, could acquire real estate by purchase, although expressly forbidden by the laws, why could not Anna Maria Sparks, also an alien to Mexico, acquire by inheritance—one of the known modes of acquisition ?

It will not be denied, that under the foregoing decision she might have purchased and held real estate, at the time of Leidesdorff's death, and to say that she might do this, and still be disqualified from taking by inheritance, would involve a legal solecism. In addition to this, it would be difficult to establish the doctrine, on authority or argument, that the United States, after the treaty, became vested with authority to prosecute any claim for a forfeiture that had accrued in California to the Mexican Government.

From the foregoing, it must follow that, as there was no inquest of office under the Mexican laws in relation to the property in question, Anna Maria Sparks held the same until the change of Governments, and that no disability existing under the laws and Constitution of the United States, and no means being provided for instituting this proceeding or declaring a forfeiture, she became vested with the absolute title which cannot now be disturbed.

Judgment affirmed.