Points decided.

# MARIE DE VIGNES DE RACOUILLAT, ETIENE L. RA-COUILLAT, ELIZABETH VIGNES, AND JEANNE VIGNES SIGNE *v.* PIERRE SANSEVAIN, JEAN LOUIS SANSEVAIN, JOHN E. RENE, JEAN VIG-NES, AND MANUEL REQUENA, EXECUTOR OF THE ESTATE OF J. L. VIGNES, DECEASED.

RATIFICATION OF ACT OF ATTORNEY IN FACT.—If the Court finds as a fact that one person executed a written instrument for another as his attorney in fact, without any power to do so, but that the constituent afterwards expressly ratified the act, the presumption will be that the ratification was in some legal and sufficient mode.

CONTRACT OF MARRIED WOMAN.—If a married woman acquired property by inheritance in California before its transfer to the United States, her power to contract concerning it is not governed by the Act of April 17th, 1850, " defining the rights and duties of husband and wife."

SEPARATE PROPERTY OF WIFE.—Property acquired by descent by a · married woman in California before its cession to the United States, became her separate property under the Mexican law.

POWER OF ATTORNEY OF MARRIED WOMAN.—A married woman may make a valid executory contract, by her attorney in fact, affecting her separate estate acquired by her in California before its cession to the United States, and her husband may be such attorney in fact.

SALE OF CHILDREN'S INTEREST IN THE COMMON PROPERTY TO THEIR FATHER.—If children, upon the death of their mother, inherit one half the common property, a sale by them of this interest to the father, even by an instrument which creates a right in his favor against them which he can only enforce in equity, is a sufficient consideration to support a promise by him to pay them for the same.

RIGHT OF ALIEN TO HOLD PROPERTY.—The question of the right of a non-resident alien to hold property, at common law and under the civil law, was a matter between the alien and the Government, and could not be called in question in a collateral action between individuals.

AGREEMENT BETWEEN CHILDREN AND FATHER.—A claim set up by children to a part of the common property upon the death of their mother, who was a non-resident alien, is a sufficient consideration to render valid an agreement of compromise with their father, by which they convey to him and he promises to pay them a consideration therefor.

CONSTRUCTION OF CONTRACT.—The object to be attained in the construction of a contract is to ascertain from its language, if possible, the intention of the parties.

RECORDING INSTRUMENTS NOT SEALED.—Mortgages and conveyances which are not under seal, are not entitled to be recorded.

NOTICE IMPARTED BY RECORDING DEEDS.—The record of mortgages and conveyances which are not under seal, does not impart notice to subsequent purchasers or encumbrancers.

EXECUTORY CONTRACT FOR MORTGAGE.—An agreement in writing, which by its terms makes a sum of money due from one to the other chargeable as a lien upon land, but which is neither under seal, nor so executed or acknowledged as to make it a mortgage within the Act concerning conveyances, will be regarded as

an executory agreement for a mortgage, and enforced in equity as a specific lien upon the land, as against the person executing and strangers having actual notice.

AGREEMENT CREATING INCUMBRANCE ON LAND.—An agreement not so executed or sealed as to make it a mortgage, signed by both parties, which provides that the purchase money of land shall be secured by the property if not sold, or by the purchase money if sold, is an incumbrance on the land as against the party executing and strangers with actual knowledge, which may be removed by a sale and substituted security on the purchase money.

COVENANT IN A MORTGAGE.—If the mortgagor covenants in the mortgage that he will pay and discharge, whenever the same becomes due, all legal mortgages and incumbrances, of whatever nature and description, upon the mortgaged property, of a previous date, the covenant will make the mortgagor personally liable for a sum due and secured by an executory-contract for a mortgage not under seal or recorded, if the mortgagor had actual notice of it, and the mortgage will become security for the performance of this covenant.

JUDGMENT AGAINST EXECUTOR.—A judgment against an executor for a demand against the testator, should direct that the same be paid in due course of administration.

APPEAL from the District Court, First Judicial District, Los Angeles County.

The Court below rendered judgment against the defendants Pierre and Jean Louis Sansevain, and Requena, the executor, but gave judgment in favor of defendant Rene. The defendants against whom judgment was rendered appealed.

The other facts are stated in the opinion of the Court.

*Baldwin & Felton,* for Appellants.

The plaintiffs cannot sue upon the clause in the mortgage executed by Pierre Sansevain and his wife, Paula S. Sansevain, to Jean Vignes, because they are not mentioned in said mortgage, are not parties thereto, and have no legal interest therein. (See Chitty on Pleading, Vol. I, pp. 4, 5.) The claims set up in the complaint have never been allowed by the executor. He has refused to allow them, and the remedy of plaintiffs was to bring suit against him within three months from the date of rejection.

*Felton & Hittell,* also for Appellants.

48

Whatever may have been the rights and equities as between Jean Louis Vignes and his children, it seems to us that the plain, unquestionable meaning conveyed to any person who might become a purchaser, was that it would be perfectly safe for him to buy from Jean Louis Vignes as "the sole and only proprietor," and that payment to him would be an entire discharge of any and all claims. It was certainly not the intention to merely give the father power to sell in his own name the interests of the children; or in other words, to create in favor of the children a covenant running with the land, and obliging the purchaser to see to the application of the purchase money; on the contrary, it seems to us that the meaning was, as the words imply, that in case of a sale Jean Louis Vignes might sell as "sole and only proprietor;" which he could not do if the construction put upon the instrument is correct.

We may admit that the intention of the parties to the instrument of March 13th, 1851, was, if the Aliso should be sold, that the amount coming to the children should be secured upon the purchase money; but we do not admit that the purchaser was bound to see to the security. That was a matter entirely between the father and the children. As long as the Aliso remained in his hands it was to be regarded as between themselves as charged with the children's portions, and if it should be sold that the money received by the father should be charged in the same manner; but that the land itself should be entirely free and unincumbered. This was the way in which Jean Louis Vignes evidently understood it at the time he made the deed to the Sansevains, and the way in which the Sansevains understood it, both when they purchased and when they afterwards paid the purchase money. It was not for a moment intended or understood that the children, or any of them, should have any claim, interest, or equity as against the purchaser. The purchaser was to know no one in his purchase but the father, as the "sole and only proprietor." It was the father and not the purchaser who guaranteed the children's portions, and his guarantee, far from

being a charge upon the land, was expressly left to be given when and how he thought proper.

*V. E. Howard*, for Respondents.

If the instrument of 1851 is not good on the part of Mr. Vignes as a mortgage, it will operate as an agreement to make a mortgage, and a Court of equity will reform it and enforce it accordingly, as complaint prays the appropriate relief. (*Dalton* v. *Warschauer*, 21 Cal. 625; 12 Cal. 575.) There can be no doubt that an agreement for a mortgage is an incumbrance, if not technically a mortgage. (2 Hilliard on Real Property, 397–413.) The property in the hands of Mr. Vignes was a trust to pay the debt to his children, and extended to the proceeds as well as to the property. (2 Hilliard, 397.) The purchaser was bound to look to the application of the purchase money. (2 Story's Eq., Sec. 1,127.) The instrument of 1851 expressly declares that in case of sale the mortgage shall extend to the proceeds of the sale. The purchase money was therefore as much bound as the property itself. The right to sell was only a privilege granted for the accommodation of the debtor, if indeed it existed without the release of the mortgage. The power to sell is coupled with the duty to secure the debt on the purchase money. (*Wormly* v. *Wormly*, 8 Wheaton, 421.) The debt mentioned being specific in its nature comes within the principle of the cases requiring the purchaser of property thus charged to look to the application of the purchase money.

By the Court, SAWYER, J.:

Jean Louis Vignes, a citizen of France, came to California about the year 1827, and settled at Los Angeles, where he resided till his death, in January, 1862. He left in France a wife and four children, Marie, Elizabeth, Jeanne, and Jean. The wife of Vignes died in France about the year 1843, having never been in this country. Said Vignes, at the time of the death of his wife, owned a tract of land in Los Angeles,

called "Aliso," which he purchased during his residence in that place. Marie, one of the children, is the wife of plaintiff, E. L. Racouillat. Marie and Elizabeth have never been in California. After the death of Madame Vignes, the children insisted that the property thus acquired by said Jean Louis Vignes, including the said "Aliso," was common property under the laws of Mexico, and accordingly set up a claim to one half, as heirs of their mother. On the 13th of March, 1851, while said Vignes was still in possession of the "Aliso" property, for the purpose of settling their claims, an instrument in writing, in the French language, was executed by the father, said Jean Louis Vignes, and two of the children, Jeanne and Jean, and by Racouillat, claiming to act by virtue of a power of attorney on behalf of the other two—his wife, Marie, and Elizabeth. The following is a translation of the material portions of said instrument:

"Agreement holding the place and stead of a settlement and liquidation concerning the estate (*l'hcritage:* inheritance) of Mrs. Vignes, wife and mother of the parties in interest (*co-intcresses*) hereafter (named):

"Article 1. Mr. Vignes regulates (*regle:* adjusts, disposes of, settles) the part of the first quarter as follows:

"Mrs. Racouillat, born Vignes, Marie;

"Miss Elizabeth Vignes, Sister Catharine of the Angels;

"Mrs. Widow Signe, born Vignes, Jeanne;

"Mr. Vignes, John;

"To each one the sum of three thousand dollars, to be paid and received (*a recevoir*) pursuant to the agreement made between the said Mr. Vignes and each one of his children hereinafter named.

"Art. 2. For the second quarter of which Mr. Vignes is usufructuary (*usufrutier*) each one of the heirs shall receive a sum of five thousand five hundred dollars, either after or before his decease, if he thinks it possible (*sil le juge possible:* as he thinks best—deems possible in his own judgment) and the total sum shall be guaranteed (*sera garantie sur:* warranted

by, secured by, made good by) the property in the Pueblo, called the 'Aliso,' if he does not sell it, or by the consideration money (*prix d' acquisition:* price of the purchase) if he does sell it.

"Art. 3.    The acceptation of these conditions (*l' acceptation de ces conditions:* execution of this instrument or agreement) extinguishes (*etient:* annuls, renders void) all rights, holds the place and stead of a final settlement (*liquidation:* liquidation) confers on Mr. Vignes all the rights enjoyed by (*devolu:* escheated to, devolving on) a sole and only proprietor, and grants him the right (*permet:* allows him) to act in that capacity, either in the presence or absence (*soit en-soit:* as well as) of the said heirs or representatives, subject, however, to his complying with (*se conformant a*) the guaranty (*guarantie:* security) stipulated for the sum allowed (*accordee:* accorded, admitted, conceded.)"

This instrument was acknowledged, though, perhaps, not in due form, deposited with the Recorder of Los Angeles County for record, and by him copied into "Book B" of deeds and mortgages.    At the time of the execution of the said instrument, Racouillat had an instrument in writing, duly executed and acknowledged by his wife, Marie, and purporting to be a power of attorney.    No power of attorney from Elizabeth was proved, but the Court finds that "the ratification of the said acts of her attorney has been established by the express ratification of the said Elizabeth, and by a reception from J. L. Vignes of a portion of the consideration money through her agent, Madame Signe."

On the 3d day of April, 1855, said Jean Louis Vignes executed and delivered to the defendants, Pierre and Jean Louis Sansevain, a conveyance of the said "Aliso" property, with covenant of warranty of title, and "that the said premises were free and clear of all incumbrances of what nature or kind soever, for the consideration of forty thousand dollars, which was receipted by the said Vignes, and consisted in part of the sums secured by the mortgage next hereinafter men-

tioned." To secure the payment of a part of the purchase money, the said Sansevains executed and delivered to said Vignes a mortgage, bearing the same date as the deed of conveyance, which contained the conditions and covenants hereinafter fully cited in the course of this opinion. Said deed and mortgage were duly acknowledged and soon after recorded. At the date of said deed and mortgage, both of said defendants, Sansevain, had actual notice of such instrument executed by Vignes and his said children. At the said time there was also a mortgage of record for three thousand dollars, executed by said Jean Louis Vignes in favor of Tobi & Schlessinger, upon said "Aliso" property, which was subsequently paid at maturity by said Sansevains. In the summer and fall of 1855, said Elizabeth, Jeanne Vignes Signe, and said Racouillàt were informed of said sale and mortgage. Afterwards, in 1855, Racouillat received from said Sansevains fifteen hundred dollars, and in the years 1857 and 1858 Madam Jeanne Vignes Signe received two thousand four hundred dollars, partly for herself, and partly for her father, and in 1858 three thousand dollars more for herself—the last named sum being the sum mentioned in the said instrument of March 13, 1851, as coming to her—with the knowledge on the part of said several parties, that the said several sums were paid on account of said Vignes, out of the annuity reserved to him by said mortgage on the "Aliso" property. Manuel Requena is the executor named in the will of said Jean Louis Vignes.

After the death of Vignes, the father, the said children, Marie, Elizabeth and Jeanne, severally presented to Requena, executor, as claims against the estate of Vignes, the several sums of five thousand five hundred dollars, mentioned in the second article of said instrument of March 13, 1851, as coming to them respectively—the said sums having never been paid—which claims were rejected. Thereupon the claimants commenced this suit against Requena, executor, the two Sansevains, Rene, and their brother Jean Vignes—the latter having been made defendant because he refused to join as plaintiff.

The first question to be disposed of relates to the execution

of the said agreement of compromise of March 13th, 1851, between Vignes and his children. It is claimed that this was designed by Vignes to be a settlement of the whole matter; that it is not a valid agreement as to one, unless it is binding on all of the ostensible parties; that Racouillat had no authority to act for Madame Racouillat, his wife, or for Elizabeth, whom he professed to represent as attorney; that his act on their behalf is void for want of power, and the agreement not binding upon them; and that, for want of execution on their part, the instrument is void as to all.

The Court found, as we have seen, by the statement of facts already given, "that the ratification of the said acts of her attorney has been established by the express ratification of the said Elizabeth, and by a reception from J. L. Vignes of a portion of the consideration money," etc. There was, then, an "express ratification" by her, as well as a ratification by implication. This is a fact found in the case. The mode, or form in which this express ratification was accomplished is not stated; but it must be presumed, in favor of the correct action of the Court, nothing to the contrary appearing, that it was in some legal and sufficient mode. If a ratification by a written instrument is required, such ratification, under the findings and judgment, must be presumed to have been shown. This disposes of the objection so far as Elizabeth is concerned.

Marie Vignes—Madam Racouillat—was a *feme covert*, married about the year 1829, still residing in France, and who had never been in California. Her interest, if she had any— her claim as heir to her mother—accrued in 1843, long before the transfer of California to the United States. Her right in the "Aliso" property, whatever it was, accrued under the Mexican law. It was, therefore, so far as her power to contract concerning it is involved, not governed by the Act of April 17th, 1850, "defining the rights and duties of husband and wife." (*Ingoldsby* v. *Juan*, 12 Cal. 564; *Bodley* v. *Ferguson*, 30 Cal. 511.) The latter case has been decided since the re-argument in this case was ordered, and by its aid we shall be able to solve the question now under consideration,

without discussing the many other embarrassing questions before suggested in the case. Madame Racouillat, under the Mexican law, was empowered, at least, with the consent and assistance of her husband, to contract with respect to her separate estate, whether real or personal. And her interest in the "Aliso" property, whatever it was, was separate estate. This power continued after the transfer of the sovereignty to the United States, and after the establishment of the State Government and the adoption of a new system of laws, unless there was some limitation put upon the power by the new statutes. The only statutes relating to the subject brought to our notice, are, the Act "concerning conveyances," passed April 16th; the Act "defining the rights and duties of husband and wife," passed April 17th; the "Act adopting the common law," passed April 13th; and the Statute of Frauds, passed April 19th, 1850. The Act defining the rights and duties of husband and wife, we have already seen, has no application. In *Bodley* v. *Ferguson* we held, that the provisions of the Act concerning conveyances do not apply to *executory* contracts concerning real estate, and that such a contract with respect to the separate estate of the wife, so far as the provisions of that Act are concerned, need not be executed by a married woman with the formalities prescribed by the Act. We also held that a contract of conveyance, accompanied by a conveyance so defectively executed as not to pass the legal title, and a part performance, might still, in equity, be good as a contract to convey, and might be enforced by a judgment for specific performance. The Act adopting the common law as the rule of decision, except so far as it might be repugnant to, or inconsistent with, the Constitution of the United States, or the Constitution of the State of California, conceding it to have any bearing upon the question, is not inconsistent with the power of the wife to make a valid contract with respect to her separate estate in the form adopted. It is well settled in England, and the older States, that, unless especially restrained by the instrument under which the separate estate is acquired, a married woman, in equity, could deal with her

separate estate as a *feme sole*—that it being once established that a wife might enjoy separate estate as a *feme sole*, the laws of property attached to this new estate, and, as a part of such law, the power of alienation belonged to the wife. (*Maclay* v. *Love*, 25 Cal. 379; *Yale* v. *Dederer*, 18 N. Y. 267–70, 277; 22 N. Y. 452; *Jaques* v. *Methodist Episcopal Church*, 17 John. 578–9, 585; *Tullett* v. *Armstrong*, 1 Bev. 21–2, 32; 4 My. and Cr. 393, 405; *Baggett* v. *Meeux*, 1 Phil. 628.)   The interest of Madame Racouillat vested under the Mexican law, and was separate estate.   It was protected as such by the treaty of cession, and by Article XI, section fourteen of the Constitution, and, as we have seen, no law affecting her power to make an executory contract concerning it had been passed. The agreement in question, if it had been executed by the wife in person, would, at least, have been valid in equity, as an executory contract for disposing of her interest in the land, and as such would not be within the provisions of the Act concerning conveyances, as we held in *Bodley* v. *Ferguson*, or repugnant to the common law, so far as it was at the time in force in this State, and certainly not within the Statute of Frauds.   If the wife could herself, in person, make a valid contract affecting her separate estate, we see no reason, independent of any statutory restriction, why she might not do it by attorney, or why the husband might not be the attorney.   It was held that a married woman might charge her separate estate "in person, or by her legally authorized agent," in *North Am. Coal Co.* v. *Digett*, 7 Paige, 14; and this ruling was affirmed on writ of error.   (20 Wend. 572.)   The authorities cited from our own reports to the contrary, by the appellant, are all based upon the statute concerning conveyances, and the Act defining the rights and duties of husband and wife, already considered, and are therefore inapplicable.

The Court finds that Racouillat acted under a power of attorney from his wife, "duly acknowledged" and "duly certified."   The instrument of March 13th, 1851, was therefore executed, at the time it bears date, by all the parties except

49

Elizabeth, and the execution on her behalf was adopted by a subsequent "express ratification" and a reception of a portion of the consideration money. The instrument thus executed and adopted created a right in favor of the father as against all the children, which could be enforced, at least in equity, if not at law, and there was a valuable and sufficient consideration for his promise to pay to his children the several sums specified in the agreement to be paid to them respectively, so far, at least, as the terms and execution of the agreement are concerned.

But, it is said, that the mother was a non-resident alien, and could not acquire any estate in common with her husband, under the laws of Mexico; that the children could inherit nothing from the mother in whom there was nothing to inherit; that two, at least, are non-resident aliens, and, on that ground, are incapable of inheriting; that there was nothing valuable to constitute the basis of, or furnish a consideration for, a contract; and that the agreement, therefore, is *nudum pactum.* Under the view we take, it is unnecessary to ascertain the exact *status* of the wife under the Mexican law with reference to this property, or the precise nature of the estate which the children took, if any, as heirs of the mother; or, whether a non-resident alien could inherit. The question as to the rights of a non-resident alien to hold property at common law, and, as we understand it, under the civil law, was a matter between the alien and the Government, and could not be called in question in a collateral proceeding between individuals. The proceeding, at common law, to divest an alien of property purchased, is by an inquest of office; and, till office found, an alien may hold real estate. Under the civil law there was some analogous proceeding. (*Ramirez* v. *Kent,* 2 Cal. 560 ; *People* v. *Folsom,* 5 Cal. 378 ; *Merle* v. *Mathews,* 26 Cal. 477.) There was, in this instance, a claim set up by the children against the father, as heirs of the mother, to one half the property acquired during the marriage under laws recognizing a community of interests, had the wife actually followed the husband to, and resided with

him in, California.   Whether the domicil of the husband was regarded in such a case as the domicil of the wife, by the Mexican law, we need not now inquire.   The least that can be said, is, that a well grounded controversy had arisen which might require years of expensive litigation to settle.   But the husband seems, from the recitals of the agreement, to have recognized the right, and it is expressly stated that the agreement is to hold "the place and stead of a settlement and liquidation concerning the estate of Mrs. Vignes, wife and mother of the parties in interest."   We think the claim made and admitted or contested, as the fact may have been, was sufficient to form the subject matter of a valid agreement of compromise, and that the agreement actually entered into is not void on the ground claimed.

The next point for consideration is the construction of the agreement; and the great difficulty in this branch of the case arises from the fact that the parties are French, who had been educated in a different language, and were accustomed to a different system of laws from that which prevailed at the time when the agreement was made, and by which it must be construed.   We have before had occasion to remark that, in many instances, it is impossible to translate an agreement made in one language by parties speaking that language alone, into another, so as to convey to those speaking the latter language, only, the precise idea intended to be expressed by the parties to such agreement.   In the present case the agreement in French, when translated into English, does not, by any means, express the contract of the parties in the form or terms that would be used by any party accustomed to the common law in reducing the same contract to writing in the English language.   Nor is it to be expected that it would. But the object of construction is to ascertain, if possible, from the language used, the intention of the parties.   In this instance, although the form of expression is not such as would have been adopted by one using the English language in drafting a common law document, we think, upon a careful view of the whole instrument, there can be little doubt as to

what was really contemplated. The amount to be paid by Mr. Vignes to his children was fixed by the agreement. The amount to be paid for one half the mother's share—"the first quarter" [of the whole estate]—as expressed in the instrument, was due at once, as there is no time specified. The remaining sums of five thousand five hundred dollars each for the other half, or "second quarter," Mr. Vignes was to have the use of, if he desired, and they were to be payable during life, or after his death, at his option. The amount was doubtless made larger in consequence of the postponement of the time of payment. It was further provided that "the total sum shall be guaranteed by (warranted by, secured by, made good by) the property in the pueblo called the 'Aliso,' if he does not sell it; or by the consideration money (price of purchase) if he does sell it." These were the acts to be performed by Vignes, and the rights acquired by the children. On the other hand, "the acceptation of these conditions (execution of the instrument or agreement) extinguishes all rights [of the children], holds the place, and stead of a final settlement, confers on Vignes all the rights enjoyed by (devolving on) a sole and only proprietor, and grants him the right to act in that capacity either in the presence or absence of the said heirs, or their representatives, subject, however, to his complying with the guarantee stipulated for the sum allowed." These are the rights conferred on the father. We have little doubt, after a careful examination of this language, that it was the intention of the parties to make the total sum provided for in the second article, at least, chargeable as a lien upon the land, so long as it should remain unsold, and the property of the father; and, in case he should sell it, that he should secure it in some mode on the purchase money. Had the father died, still owning the land, we think, under the terms of this agreement, the said sums due would, by virtue of the agreement, have continued to be a lien upon the property. But it was not contemplated that the lien should be an obstacle in the way of a sale, and it was provided that the rights of the heirs should be extinguished, and that Vignes

should exercise all the rights of a sole proprietor and act in that capacity either in the presence or absence of the heirs or their representatives, subject to his complying with the guarantee—that is to say, that if he should exercise the rights and powers of a sole proprietor and sell the land, and thereby discharge it from the lien, it must be on the condition that the moneys due the children under the agreement be at the same time secured on the purchase money. This is manifestly the intent of the parties to the agreement to be gathered from the terms. But the instrument is not under seal, and as to Mrs. Racouillat, at least, is not executed and acknowledged so as to make it a mortgage or conveyance within the provisions of the Act concerning conveyances; nor is it entitled to record; nor, being copied into the records, does it impart notice to subsequent purchasers or incumbrancers. Still, in equity, the instrument would be regarded as an executory agreement for a mortgage, or a security in pursuance of the intentions expressed, and in a Court of equity it would be held to be, and enforced as a specific lien upon the land. We so held at the last term, in *Daggett, administrator* v. *Rankin*, 31 Cal. 321. In that case we said : " The doctrine seems to be well established that an agreement in writing to give a mortgage, or a mortgage defectively executed, or an imperfect attempt to create a mortgage, or to appropriate specific property to the discharge of a particular debt, will create a mortgage in equity, or a specific lien on the property so intended to be mortgaged. (1 Am. Lead. Cases in Eq. 510; *Howe's Case*, 1 Paige, 125.) The maxim of equity upon which this doctrine rests, is, that equity looks upon things agreed to be done as actually performed; the meaning of which is, that equity will treat the subject matter as to collateral consequences and incidents in the same manner as if the final acts contemplated by the parties had been executed exactly as they ought to have been. (Sto. Eq. Jur., Secs. 64, 790 ; Willard's Eq. 298–9, 422.)" This covers the point. The agreement, then, in equity, constituted a lien upon the premises, as against the father, while they remained unsold, which would be enforced as against

him, and by which strangers having actual notice would be affected. It was an incumbrance on the land which might be removed by a sale and substituted security on the purchase money.

On the 3d of April, 1855, Jean Louis Vignes, the father, conveyed the said "Aliso" property to the defendants, Pierre and Jean Louis Sansevain, with a covenant "that the said premises were free and clear of all incumbrances of what nature or kind soever" as we have seen, and said defendants Sansevains, "to secure the payment of part of the purchase money of said property," mortgaged the same back by deed of mortgage bearing the same date, duly acknowledged and recorded. Said mortgage contained the following covenants, viz: "This grant is intended as a security for the payment of, to the party of the second part, as follows, to wit: That the parties of the first part agree and promise to pay to the party of the second part the sum of two thousand five hundred dollars each and every year during the natural life of the said party of the second part, said sum to be paid at such time during each and every year as the said party of the second part may request. That the said parties of the first part will also give to the said party of the second part the use, free of rent or charge, of the north wing of the building on the premises aforesaid, and the 'orangery' or inclosure in the rear thereof, during the period of the natural lifetime of the said party of the second part. That the said parties of the first part will also give to the said party of the second part the full, free and unlimited privilege to pass and repass over and about and upon any of the premises aforesaid. That the said party of the first part will give and pay to Jean Vignes, son of the party of the second part, during the natural life of the said Jean Vignes, the annual sum of eight hundred francs, whenever and wherever they may be thereunto requested, and also pay the expenses of a passage for the said Jean Vignes to France, and that the said parties of the first part will also pay and discharge all legal mortgages and incumbrances, of whatever nature and description, upon the aforementioned and

described property, at and previous to the present date, whenever the same shall become due."

At "the time of the execution and delivery of the deed last aforesaid (Vignes to Sansevain) and of the mortgage from defendants Sansevains to Vignes, both of the said Sansevains had actual notice of the instrument in French, marked 'Exhibit D'"—the said agreement of March 13th, 1851, between said Vignes and his children.

At the time of the execution of said mortgage by said Sansevains to Vignes, there was also duly recorded in the office of the Recorder of Los Angeles County a mortgage upon said "Aliso" property, executed by said Jean Louis Vignes to Tobi & Schlessinger, to secure the payment of the sum of three thousand dollars and interest, which was subsequently paid at maturity by said Sansevains. These are the only incumbrances upon said property at that time, disclosed by the record.

The next question in order is whether, upon this state of facts, the lien provided for in said agreement of March 13, 1851, between Vignes and his children, is a legal incumbrance, within the meaning of the term, as used in the condition of the mortgage from the Sansevains to Vignes, which they expressly covenanted to pay, and for which they thereby became personally liable. We are satisfied that it is. There appears to have been at the time but one other incumbrance; and the covenant does not refer in express terms to that particular mortgage to Tobi & Schlessinger, as we should naturally expect it would, if the intention had been to limit the covenant to that incumbrance; but, on the contrary, the covenant is that they (the Sansevains) "will also pay and discharge *all legal mortgages and incumbrances of whatever nature and description * * at and previous to the present date.*" This language is certainly sufficiently comprehensive to include everything in the nature of an incumbrance, of which the covenanters had notice, actual or constructive, at the time; and, when construed with reference to the circumstances of the parties and property, we cannot doubt that the lien in

question was intended to be, and is, embraced within the terms of the covenant. Vignes had agreed with his children that the amount to be paid to them, in the second article at least, should be secured on the land, *if he did not sell it*, and *on the purchase money, if he did sell it*. And, upon the condition that he should so secure it, he was authorized to sell. Upon a sale he was, therefore, under obligation to provide for securing the amount on the purchase money. He was about to sell, and must be supposed to have had this obligation in his mind in settling upon the terms and conditions of the sale. The Sansevains also had notice of the agreement and the said obligations of Vignes. A personal covenant in the mortgage *on the part of the Sansevains to pay this incumbrance*, and a security in the mortgage for the performance of the covenant, would be a security upon the purchase money and a discharge of the obligation of the father, contained in the said agreement with his children. If the claim of the children is not embraced in the covenant of the Sansevains, their claims would not be secured on the purchase money, and the obligation of the father would not be fulfilled, unless it could be enforced as a lien, notwithstanding the omission. We think, however, upon viewing the instrument in connection with the surrounding circumstances, the only reasonable inference is that both Vignes and the Sansevains had in view the said agreement and obligation of the former, and intended to provide, and did provide, for it in the covenant in question. Appellants' counsel lay great stress upon the term " *legal* " used in the covenant—" all *legal* mortgages and incumbrances "—and insist that the incumbrance is, at most, only an *equitable*, and in no sense a *legal*, incumbrance, and therefore not within the covenant. The word " legal," we apprehend, was not used here as contradistinguished from equitable. These French gentlemen, who were educated under the civil law which had so recently been abrogated, could hardly have been so critically informed of the nice distinction between legal and equitable incumbrances, as these terms are used in the common law and equity jurisprudence of England and the

United States.   If it had been their intention to make this nice distinction, they would have been much more likely to have adopted some other and less technical mode of expressing their ideas.   The word *legal*, in this connection, doubtless signifies nothing more or less than *lawful;* and we have before seen that the law recognizes the claim of the children under their contract with their father, as a lien or incumbrance, which a Court of equity will enforce.   But, admitting a lien in favor of the plaintiffs while Vignes owned the land, and that the defendants Sansevains had notice, it is further urged, that Vignes, by the terms of the agreement, was authorized to sell and substitute a security upon the purchase money ; that he did sell and by the act of sale the lien was discharged, and, from that moment, ceased to be an incumbrance ; and that there was, therefore, no incumbrance to which the covenant could apply.   But the sale to the Sansevains and the mortgage back to secure the purchase money were cotemporaneous acts and part of one and the same transaction.   The personal covenant to pay the incumbrance, with the mortgage to secure the performance of the covenant, was a part of the contract of sale—the very condition upon, and the means by which, the incumbrance originally existing was discharged and a new one substituted.   Besides, the covenant itself affords another and insuperable answer to the objection.   The language expressly is : " Will also pay and discharge all legal mortgages and incumbrances, of whatever nature and description    *    *    *    at and *previous to* the present date."   If the incumbrance ceased by the act of sale, it was still an incumbrance " *previous to the present date* "—the date of the act of sale—and was still within the covenant.

The conveyance from Vignes to the Sansevains, as we have seen, contains a covenant " that the said premises were free and clear of all incumbrances of what nature or kind soever," while the mortgage of the Sansevains contains a seemingly inconsistent covenant on their part to " pay and discharge all legal mortgages and incumbrances, of whatever nature and

50

description," etc. And it is argued that as these two instruments must be construed together as parts and parcels of one and the same transaction and agreement, some effect must, if possible, be given to the covenant in the deed as well as to the covenant in the mortgage; that no effect can be given to the covenant in the deed unless it be held that although the Sansevains are to pay and discharge the incumbrance, they are still to charge it to Vignes, in their account with him, as a part of the purchase money, and that the object of the covenant manifestly was, to protect themselves against the claims of the plaintiffs, rather than to benefit the plaintiffs. Admit this to be so, for the purposes of the argument, and we are still unable to discover that any inference favorable to the appellants follows from the premises. The amount of the incumbrances thus assumed may still be a part of the purchase money agreed to be paid. It nowhere appears in the record that the whole amount of purchase money has ever been paid. On the contrary, it is substantially found by the Court that, although receipted for, the forty thousand dollars was not paid, and that the amounts covenanted in the mortgage to be paid by the Sansevains was a part of said sum of forty thousand dollars and of the purchase money. The language of the finding is: " for the consideration of forty thousand dollars, which was receipted for by the said Vignes, and consisted in part of the *sums secured by the mortgage next hereinafter mentioned.*" According to our construction of the several instruments, the amount to be paid to the plaintiff under the personal covenants of the Sansevains is a part of the sum secured by the mortgage—it was also so held by the District Court—and it is, therefore, found by the Court to be a part of the said sum of forty thousand dollars consideration money. And this is really in harmony with the construction which, appellants' counsel say, must be put on the covenants in the conveyance to the Sansevains, and in their mortgage back, when regarded as a part of one composite instrument. In this way the Sansevains could effectually protect themselves against the incumbrance of the plaintiffs by discharging it

when due—that is to say, on the death of Vignes—out of the purchase money reserved in their hands for that purpose, and thus the object of the covenants supposed by appellants' counsel would be fully accomplished.

It may be doubted whether the sums specified in the "first quarter" were designed to be, or were, embraced in the terms of the stipulation for security upon the land if not sold, or on the purchase money if sold. As before remarked, no time for payment of those sums is specified, and they became due immediately. It was, doubtless, supposed that they would be paid soon. But the sums specified in the second article were to remain unpaid till the decease of the father, if he should so choose, and it would be natural that security for ultimate payment should be desired. It is not clear that the security provided for was not designed to be limited to those sums. The agreement is, perhaps, open to such construction, and this seems to have been the practical construction put upon it by the parties; for, it is found, " that Elizabeth Vignes received from the Sansevains the sum of three thousand dollars, mentioned as coming to her in the instrument of March 13th, 1851, * * * paid on account of the said Vignes out of the annuity aforesaid;" that is to say, out of the two thousand five hundred dollars per annum covenanted by the Sansevains in their mortgage to be paid said Vignes during his life. The three thousand dollars mentioned is found in the first article of the agreement of March 13th, 1851. Other sums were paid to other of the plaintiffs out of said annuity, but, whether on account of the sums due under the said agreement, or for some other purpose, does not appear. But whether this is the proper construction or not, we are unable to perceive from the record that the aggregate of the sums actually paid, or covenanted to be paid, or that the defendants were liable to be called upon to pay, under the construction we have given the contract, was likely, under any contingency, to exceed the consideration named. That portion of the purchase money depending upon the number of years Vignes might live, was, of course, necessarily indefinite as to amount. But

he was aged and infirm, and not likely to survive long, and the defendants, Sansevains, by their covenant, took the chances as to the extent of their liability depending upon his decease. Besides, Vignes, by his agreement with the plaintiffs, was to have the use, during his life, of the several sums not payable till his death, and the two thousand five hundred dollars to be paid to him annually by the Sansevains, may have been, and probably was, the interest on these sums. By receiving the interest he enjoyed the use of the principal. The aggregate amount due the children on the second quarter was twenty-two thousand dollars, and two thousand five hundred dollars per annum would be less than one per cent per month interest —not an extraordinary rate of interest for this State at that time, or even since.

Nor can any inference affecting the question be drawn from the covenants to pay a certain small sum annually to the son, Jean Vignes, during his life, or the other covenants for his benefit. We do not know what arrangements the Sansevains entered into with him in connection with these transactions. He declined to join in this action, and his claim must be presumed to have been satisfactorily arranged.

We have now discussed all the points made in the briefs and arguments of counsel necessary to a determination of the cause, under the view we take, so far as the appellants, the Sansevains, are concerned, and the result is that the amount due plaintiffs under the second article of the agreement of March 13, 1851, was an incumbrance on the "Aliso" property within the meaning of the covenants in their mortgage to Vignes, and that they are personally liable for the same upon their said covenants "to pay and discharge all legal mortgages and incumbrances." The judgment as to them, therefore, must be affirmed.

As against Requena, executor, the judgment is not technically in the proper form. It should be that he "pay in due course of administration" the amount found to be due from the estate of Vignes. (Probate Act, Sec. 140.) The form is that the plaintiffs do have and recover "against Manuel Re-

quena, as executor of the last will and testament of J. L. Vignes, deceased, the sum of," etc.   Perhaps, though not in the form prescribed by the statute, the legal effect may be the same, and possibly, under the law, the plaintiffs may not be authorized to enforce the judgment against the property of Requena.   To avoid any doubt, the judgment had better be corrected.   This may be done by adding at the end of the judgment the words: "And it is ordered and adjudged that the said Requena, executor, pay the said sums in due course of administration."   As the error is technical, and the contest has really been on the appeal of the other defendants, the modification will be made without costs.

Judgment as to defendants, Pierre and Jean Louis Sansevain, affirmed.   As to defendant Requena, executor, judgment modified in respect indicated, but without costs.

Mr. Justice SANDERSON did not express any opinion.