JUNE TERM, 1867. 689

Harley v. The State, ex rel. Attorney-General.

## HARLEY *vs.* THE STATE, ex rel. ATTORNEY-GENERAL.

[INFORMATION FOR ESCHEAT OF ALIEN'S LANDS.]

1. *Alien's right to lands.*—An alien may purchase lands, and acquires by his purchase a defeasible estate, subject to be defeated by office found; and if he becomes a naturalized citizen before an information is filed for the forfeiture of the lands, his title becomes perfect, and cannot be divested by proceedings afterwards instituted.

2. *Naturalization; sufficiency of record and plea of.*—The record of the naturalization of an alien as a citizen is not required to show affirmatively the existence of all the legal pre-requisites; nor is it necessary that a plea of naturalization, in answer to an information, should show more than the judgment or record.

APPEAL from the Circuit Court of Montgomery.
Tried before the Hon. FRANCIS BUGBEE.

THE information in this case was filed, on the 18th May, 1866, by John W. A. Sanford, as attorney-general, and alleged—1st, that on the 18th March, 1850, Alfred G. Knight and George F. Knight "were the purchasers in fee" of a certain lot in the city of Montgomery, which was particularly described in the information, "and were both unnaturalized aliens at the time they became such purchasers, and subsequent thereto"; 2d, "that afterwards, to-wit, on the 2d April, 1857, Andrew Harley became the purchaser in fee of the said lot or parcel of land, under the name of Andrew Harley & Co., and was, at the time of his said purchase, and subsequent thereto, an unnaturalized alien, and is in possession of the whole of said land, and claims the same in fee"; and, 3d, that the land was in the possession of Joseph Pizzala, as the tenant of said Harley. The information therefore prayed an inquest of office, and that the land might be declared forfeited to the State.

Harley filed a plea and answer to the information, in the following words: "Andrew Harley, by attorney, comes, and, for plea to said information, says, that the said infor-

mation was filed by the attorney-general of his own mere motion, and without any instructions from any other department of the government. For further plea in this behalf, by leave of the court first had and obtained, he says, that Alfred G. and George F. Knight were not, at any time while they held said lands, unnaturalized aliens, nor was either of them; but that they were both duly naturalized as citizens of the United States, by the judgment of the circuit court of Montgomery county, Alabama, on the 29th day of November, 1848; and he denies that Joseph Pizzala is in possession of said premises, and avers that he is himself in possession of the same, and that Joseph Pizzala merely occupies the premises as his tenant up to the 1st October next; and he alleges that he has been in possession of the same ever since the 2d day of April, 1857, at which time they were conveyed to him, while he was an unnaturalized alien; but he denies that he is now an unnaturalized alien, and avers that he was duly naturalized a citizen of the United States, on the 1st November, 1860, by the judgment of the circuit court of Cook county, Illinois, in the 7th judicial circuit of said State; and he also avers that, before the 2d day of April, 1857, he had duly filed his declaration of intention to become a citizen of the United States; all of which he is ready to verify. And for further plea in this behalf, by leave of the court first had and obtained, he says, that the premises which are described in the information are the same mentioned and conveyed in a certain deed from Lewis J. Cahn and wife to Elizabeth Pizzala, referred to in an act of the legislature of the State of Alabama for the relief of Elizabeth (*alias*) Eliza Pizzala, approved February 20th, 1866."

This plea was interposed " in short by consent," and a demurrer to it was filed in like manner, an assignment of the grounds of demurrer being waived. The court sustained the demurrer, and, the defendant declining to plead over, rendered judgment for the State, declaring the land forfeited, and the title vested in the State.

The errors now assigned are—1st, the sustaining of the demurrer to the plea; 2d, not visiting the demurrer to the plea back on the information; 3d, not rendering judgment

on the demurrer in favor of the defendant; and, 4th, the final judgment.

RICE, SEMPLE & GOLDTHWAITE, for appellant.—1. Naturalization "cancels all defects" in the capacity of an alien to take, hold, and transmit real estate, "and is allowed to have a retrospective energy."—2 Black. Com. 250; *Governeur's Heirs v. Robertson*, 11 Wheaton, 332, 350. If an alien purchaser and grantee of real estate "be naturalized before office found, his title becomes valid by relation, and it cannot be thereafter divested."—*White v. White*, 2 Metc. (Kentucky,) Rep. 189; *Jackson v. Beach*, 1 Johns. Cases, 399. The alienage of the purchaser is a cause of forfeiture to the State, which can be established only in a judicial proceeding instituted for that purpose.—*Wright v. Sadler*, 20 New York Rep. 324. No such judicial proceeding, which is instituted after the naturalization of the alien, can be maintained.

2. Alienage is attended with two classes of disabilities: 1st, an alien is disabled from defending an inquest of office, as to lands which he has lawfully acquired by purchase; 2d, he is disabled from taking any thing by descent—that is, by mere act of law. In England, the retrospective energy of an act of naturalization by parliament may be "such that it relates back to the period of the birth of the party; and consequently, where an alien wife thus is naturalized, she is thereby rendered dowable of all lands of which her husband was seized during the coverture, including those conveyed by him before her incapacity was removed."—Scribner on Dower, 145, 181. In other words, such naturalization in England may, by its retrospective operation, divest even rights which had vested in others. It removed both the aforementioned classes of disabilities, and related back to the birth of the party. Naturalization in the United States, according to some of the decisions, operates retrospectively only as to the disabilities in the first class above numbered.—*Priest v. Cummings*, 20 Wend. R. 338, and other cases cited for appellee. But it is well settled, that naturalization in the United States operates retrospectively, to free the party from the disability he was

under by alienage, to defend himself against an inquest of office begun after naturalization.—*Priest v. Cummings, supra ;* Scribner on Dower, 177.

3. The act of the legislature is clearly inoperative, as to the title which had become perfect in the alien purchaser, by his naturalization prior to the passage of that act.

4. The proceeding instituted in the court below is not authorized by any law, and cannot be sustained.

ELMORE, KEYES & MORRISETT, *contra.*—1. An alien may purchase real property in this State, and may hold it until office found. The rule has descended to us as a part of the ancient common law, and the reason of it is now but little more than a subject of inquiry for the antiquarian or the legislator.—1 Bac. Abr., tit. *Aliens,* 201; *Jenkins v. Noel,* 3 Stewart, 60 ; *Smith v. Zaner,* 4 Ala. 99 ; *Etheridge v. Malempre,* 18 Ala. 565.

2. The naturalization of an alien takes effect from the time of his being naturalized, or it relates back to the time he was *in ventre sa mere.* There can be no middle point. There is nothing in the common law, nor in the acts of congress, nor elsewhere, that justifies the position, that naturalization in this country relates back to the filing of the declaration to become a citizen ; such declaration of intention is a mere condition precedent, prescribed by act of congress. The first section of the act of 1802 is conclusive. It declares, " that any alien, being a free white person, may be admitted to become a citizen of the United States, or any of them, on the following conditions, and not otherwise ": 1st, that he shall have declared, three years before his admission, that it was his intention to become a citizen; 2d, at the time of his application to be admitted to citizenship, and not before, he must declare, on oath or affirmation, that he will support the constitution of the United States, and then, and not until then, is he required, or does he renounce allegiance to his former government ; 3d, follows a judicial investigation *(In re Clark,* 18 Barb. 444,) into the residence of the applicant, his conduct, &c., and then there is the judgment of the court, admitting him to citizenship from and after that date.—See Brightley's Di-

gest, 33. It is well settled, that a person never loses one domicile until he gains another. No one has ever heard of domiciliary rights having relation back beyond the time the new domicile was acquired.

3. The *onus* of showing that such relation back exists, in this country, in cases of naturalization, rests upon those who assert its existence. In England, there are two ways in which an alien could become capable of holding lands against the crown. One was by letters of denization from the king, and the other was by act of parliament specially naturalizing the applicant.—Bac. Abr. 198*(B)*. Denization does not operate retrospectively, (2 Black. Com. 249 ;) nor does an act of naturalization, unless it has a retrospective energy.—See *Fish v. Klein*, 2 Meriv. 431. In all such cases, it is a question merely of statutory construction. In *Vaux v. Nesbit*, (1 McCord Chan. Rep. 378,) Chancellor DeSaussure, in speaking of *Fish v. Klein*, says : "In the report of this case by Mr. Merivale, he states, that the vendor had been desirous of having retrospective words introduced into the naturalization act, which was refused, because parliament would not depart from the common form. And the words of our statutes for naturalizing aliens are evidently prospective, and do not furnish so strong a ground for retrospective operation as the words of the British act which we have just cited, and which were denied to have a retrospective force."

Scribner says, the rule may be considered settled in this country, that naturalization does not have a retrospective effect; and he recites divers authorities in support of the position.—1 Scribner on Dower, 176–82. See, also, Cruise's Digest, (Greenleaf's ed.,) where it is also said, that naturalization does not relate back. " If the alien should undertake to sell to a citizen, yet the prerogative right of forfeiture is not barred by the alienation, and it must be taken to be subject to the right of the government to seize the land."—2 Kent's Com. 61. It is the purchase by the alien which gives to the State the right to have inquest of office. The subsequent naturalization cannot, any more than alienation to a citizen, divest the right of the State to a forfeiture. The only question in either case is, the alienage at the time of the purchase.

. 4. The objection to the form of the information is not well taken. No particular form is necessary ; a statement of the facts, which shows the forfeiture of a specified parcel of land, and which is so made that issue can be taken on the merits, is sufficient. Besides, an objection to the form is too late, after a plea to the merits. Any citizen may proceed in such case, in the name, and for the benefit of the State. It has always been the practice in this State for the attorney-general to proceed *ex mero motu* in informations, and the practice in those cases which are reported certainly justifies the practice in this case.—See *The State ex rel. Attorney-General v. Williams*, 1 Ala. 342 ; *The State ex rel. Attorney-General v. Porter*, 1 Ala. 688 ; *Paul's case*, 5 Stew. & Por. 40 ; also, *Macauley v. The State*, 31 Maryland. Besides, the fact that a citizen is a relator as attorney-general, cannot affect his right as a citizen to be a relator. The most, then, that can be held,, is, that the words " as attorney-general " are surplusage.

5. It is said that the State cannot have an inquest of office, because, before the filing of the information, the right of the State had been vested by an act of the legislature, (Acts 1865–6, p. 572,) in Elizabeth Pizzala. But the act of the legislature would be nugatory, unless this proceeding in the name of the State could be had to divest the title of Harley. Statutes are never construed so as to render them nugatory, when another construction will give them effect. The grant of anything is also the grant of the means necessary to obtain possession and enjoyment of it. *Cuicumque aliquis quid concedit, concedere videtur et id sine quo res ipsa esse non potuit.*—Broom's Legal Maxims, 198. At common law, the · assignor of a right not assignable gave to the assignee the right to use the name of the assignor in a · suit at law. The act of 1865–6, above cited, operated as an abrogation, *quoad hoc*, of any and every rule of law, which might otherwise have presented an obstacle to this proceeding. But we know of no rule of law which prevented the proceeding in the name of the State.

The State cannot bring ejectment against an alien to recover real estate purchased by the alien. The title to the land vests in the State on an inquisition, by the judgment

of the court, and the right of possession follows this judg-ment. If Elizabeth Pizzala had sued to recover this real estate, upon *what title* could she have relied? Only upon that which she acquired by the provisions of the act of 1865; and she could acquire no other right or title than the State had. She could not, in her own name, and for her own benefit, institute an inquisition to ascertain to whom the al-legiance of the alien was due. That could only be done by the State. She could not sue in ejectment, because the State could not. Again, Harley was holding adversely against the world at the time the act was passed; and this act has no greater effect than a contract or conveyance; and it is well settled that, when A is in possession claiming property as his own, the real owner cannot convey to another person so as to enable him to sue and recover in his own name. He must use the name of the real owner; and when recovered in that name, the recovery enures to the benefit of the grantee, by virtue of the conveyance to him from the real owner.

JUDGE, J.—Under the demurrer interposed in the court below, the following allegations of one of the pleas are to be taken as true: 1st, that Harley purchased the lands described in the information, on the 2d day of April, 1857, and that there was a conveyance to him of the title on that day; 2d, that, at the time of the said conveyance, Harley was an unnaturalized alien, but that previously thereto he had filed his declaration of intention to become a citizen of the United States, and was duly admitted to such citizen-ship on the 1st of November, 1860, by the judgment of the circuit court of Cook county, in the State of Illinois. These allegations present the merits of the main question involved, which we proceed to consider.

An alien may acquire lands by purchase, but not by de-scent; and there is no distinction, whether the purchase be by grant or by devise; in either event, the estate vests in the alien as a defeasible estate, subject to escheat at the suit of the government. He has complete dominion over the estate of which he is thus seized, until office found; may hold it against every one, even against the govern-

ment, and may convey it to a purchaser—that is to say, may convey a defeasible estate only, subject to be divested on office found. The ancient rule of the common law was, that an alien could not maintain a real action for the recovery of lands, but he might, in such action, defend his title against all persons but the sovereign. It has been held, however, in North Carolina, if not in other States of the Union, that he may maintain ejectment. The common law was, also, that the king could not grant lands forfeited by alienage, until he was in possession by office found ; but, when the alien died, the sovereign was seized without office found, because, otherwise, the freehold would be in abeyance, as the alien could have no inheritable blood.

As to grants for the cause of alienage, by State legislation, without an inquest of office, Judge Story has said, " That an inquest of office should be made in cases of alienage, is a useful and important restraint upon public proceedings. It protects individuals from being harassed by numerous suits, introduced by litigious grantees. It enables the owner to contest the question of alienage directly, by a traverse of the office. It affords an opportunity for the public to know the nature, the value, and the extent, of its acquisitions *pro defectu hæredis*. And, above all, it operates as a salutary suppression of that corrupt influence which the avarice of speculation might otherwise urge upon the legislature. The common law, therefore, ought not to be deemed repealed, unless the language of a statute be clear and explicit for this purpose."—*Fairfax's Devisee v. Hunter's Lessee*, 7 Cranch, 603. But each State has the undoubted right to enact laws regulating the descent of, and succession to, property within its limits, and consequently to permit inheritance by or from an alien.

We refer to the following authorities, as sustaining the propositions of law hereinbefore announced : 2 Kent, 62–64; *Fairfax's Devisee v. Hunter's Lessee*, 7 Cranch, 603 ; *Orr v. Hodgson*, 4 Wheaton, 453 ; *Governeur's Heirs v. Robertson*, 11 Wheaton, 332 ; *Scanlan v. Wright*, 13 Pick. 532 ; *Montgomery v. Dorian*, 7 New Hamp. 475 ; *People v. Folsom*, 5 Cal. 373 ; *Rouche v. Williamson*, 3 Iredell, 141 ;

*Waugh v. Riley*, 8 Metcalf, (Mass.) 290 ; *Wilbur v. Tobey*, 16 Pick. 177 ; *Etheridge v. Malempre*, 18 Ala. 565.

When Harley purchased the land in controversy, and during the period of his alienage thereafter, he was seized of a defeasible estate in the premises, accompanied with all the incidents of ownership of such an estate. During the same period, the only right which the State could have in the premises was the right to have the land escheated, by a judicial proceeding in the nature of an inquest of office. This prerogative right of sovereignty was not asserted during the period of Harley's alienage ; but he was permitted to retain his estate, without molestation, until he had been admitted to full citizenship. This result effected an extinguishment of the right of the State to escheat the land, if such right existed, and perfected the title of Harley. As Sir Matthew Hale has said, " The law is very gentle in the construction of the disability of alien-ism, and rather contracts than extends its severity."— 2 Kent, 56–62. See, also, *Jackson v. Beach*, 1 Johnson's Cases, 399 ; *White v. White*, 2 Met. (Ky.) 189.

Foreigners are admitted to the rights of citizenship, with us, on liberal terms ; and the public policy of the United States, in regard to their becoming citizens, as shown by the naturalization laws of the government, is certainly in harmony with the main conclusion attained in the present case.—2 Kent's Com. 56.

2. It was contended in the argument, that the plea of naturalization is defective, in not averring compliance with the pre-requisites expressly made by the law conditions precedent to the admission to citizenship. It has been held, that it is not necessary that the record of naturaliza-tion should show that all the legal pre-requisites had been complied with, the judgment being conclusive of such compliance.—*Starke v. Chesapeake Ins. Co.*, 7 Cranch, 420 ; *Ritchie v. Putnam*, 13 Wendell, 524 ; *Spratt v. Spratt*, 4 Pet. 406. It follows, that it is not necessary to do more in the plea, than aver the rendition of the judgment.

Judgment reversed, and cause remanded.