# Donovan *v.* Pitcher *et als.*

### Real Action in the Nature of Ejectment.

1. *Descent; what law governs as to.*—The law in force at the time of de-
scent cast governs as to the capacity to take lands. If capacity is then
wanting, subsequent laws enlarging it will not operate retrospectively, so as
to divest an estate in lands which on the death of the ancestor vested in the
State or elsewhere.

2. *Comity between States; when must yield to domestic policy.*—Comity be-
tween States and citizens of different States, so far as concerns rights, priv-
ileges and immunities not guaranteed by the Constitution of the United
States, must yield to the laws and policy of the different States, and cannot
be extended in violation of the laws and public policy of the State in which
it is sought to be invoked.

3. *Free negroes, or persons of color, whose ancestors were slaves; rights of
in the year* 1859.—Under the Constitution and laws of the United States and
of the State of Alabama, as existing in the year 1859, free negroes or per-
sons of color, whose ancestors were slaves, residing in Ohio, were not citi-
zens of the United States or of that State; they were then incapable of ac-
quiring residence or citizenship here, and consequently could not take lands
here by descent.

APPEAL from Circuit Court of Mobile.

Tried before Hon. JOHN ELLIOTT.

The appellees are children of William Pitcher and his
wife Pherady. William Pitcher was a man of color, who
had been a slave, permitted by his master to go at large, re-
tain and dispose of his earnings, to acquire property, make
contracts, and in all respects to conduct himself as a free
man. In 1851, with the knowledge of, and without dissent
from his master, he left this State and went to Ohio, remain-
ing there until 1854, when he returned to Alabama, re-
mained until 1857, and then returned to Ohio, and died
there in 1859. His wife Pherady was a slave, born in North
Carolina, but was purchased by her father, a free man of
color, and brought to Alabama. She was permitted by her
father to accompany her husband to Ohio, where she has
since lived. The said William, in 1854, purchased of Wil-

[Donovan v. Pitcher.]

liam F. Cleveland the premises in controversy, received a deed conveying them to him, under which he entered into possession, made improvements, and remained in the actual occupancy of them until he left the State in 1857. After the death of said William his said widow sold and conveyed the premises to the husband of appellant, Donovan, and subsequently a conveyance of the premises was made directly to appellant by said Cleveland. The evidence of the purchase from and conveyance by said widow to the husband of appellant, was objected to, and the objection sustained. The court charged the jury, the appellees could not recover the premises if their father, said William, was a slave at his death. But if, at his death, he was a freeman, the appellees took by descent, notwithstanding they were free persons of color, then residing in Ohio. To the last branch or sentence of this charge the appellant excepted. The court also charged the jury, if the father of the appellees went to Ohio with the assent of his master, to live as a freeman, he became a freeman, entitled to buy, own and inherit property. To this charge appellant excepted. The court refused, on request of appellant, to charge the jury, that if the plaintiffs were free persons of color at the death of their father, residing in Ohio, they could not take lands from him by descent, and to this refusal appellant excepted. The matter of these exceptions is now assigned for error.

E. S. DARGAN, for appellant.—If the heir, at the death of the ancestor, be legally incapable of inheriting, a subsequent change of the law cannot help him, or enable him to inherit. Death strips the ancestor of all title, and some one must take immediately. 2 Hill, (N. Y.) 68. A title to land is the just right to possess and enjoy it; as soon therefore, as the law forbids the heir to *possess* or *hold* the land, the law forbids the descent, for it would be absurd to hold that the law, on the death of the ancestor, cast the title on the heir, and at the same time forbid his enjoying or possessing it. At the time of the death of the ancestor, if the appellees had come to Alabama to enjoy their property, they would have been guilty of a felony if they had remained for thirty days after warning to depart. How could the law say, "I give you this, but if you take it I will punish you as a felon?" This question is discussed, but not decided, in *St. Cyr* v. *Tannis* (21 Ala. 450), and it is evident from the opinion that the court took the view above presented.

MAYER & TURNER, *contra.*—When the intestate went to

[Donovan *v.* Pitcher.]

Ohio to reside, with the consent of his former owner, he became free. Constitution of Ohio; *Griffith* v. *Fannie*, Gilmer, 143; *David* v. *Porter*, 4 Har. & McHen. 415; *Commonwealth* v. *Holloway*, 2 S. & R. 305; *Benjamin* v. *Armstrong*, Ib. 392; *Griffith* v. *Fannie*, Gilmer, 143; *Rachel* v. *Walker*, 4 Miss. 350; *David* v. *Dangler*, 8 B. Mon. 539; *Lausford* v. *Coquellon*, 14 Martin, 401. In *St. Cyr* v. *Tannis*, 21 Ala. 449, this court held that the right of a freeman to hold property in this State was a common law right, enjoyed by free colored as well as by free white persons. The reasons for the act of 1832 were doubtless that it was not deemed desirable to have free negroes come in contact with slaves. The whole object of the act was accomplished, when the free colored persons were banished from the State. It was a cruel and severe act, and its scope should not be extended by construction. The law did not cut off his common law right to hold property. In *Lieper* v. *Hoffman*, 26 Miss. 615, under a similar statute, it was held, under facts very like those shown in this case, that a free negro could take and hold land. See also 2 Peters, 664. Pitcher was an inhabitant of Ohio, and he and his children derive their rights of person and property from the State of their residence. The rights secured to William Pitcher and his children in the State of Ohio would be respected in the other States where it might be necessary to assert them, and they would be enforced for reasons of comity and by the principles of private international law, unless they were incompatible with the law and policy of the State where they might be sought to be enforced. *Shaw* v. *Brown*, 35 Miss. 315; 2 Kent's Com. 453–457; Story's Conf. of Laws, § 29, *et seq.*

The reasons preventing an alien from inheriting lands are obsolete, and no longer have force in this country. 27 Barbour, 157; Kent's Commentaries, vol. 3, 513.

JUDGE, J.—The first affirmative charge given by the court, and the charge requested and refused, involve the same legal question, decisive of the cause, as it is presented by the facts incorporated in the bill of exceptions.

The inheritance of lands is not, except from necessity, by the ancient common law permitted to rest in abeyance. Such an estate was odious, because, during its continuance, "there was not seisin of the land, nor any tenant to the *praecipe*, nor any one of the ability to protect the inheritance from wrong, or to answer for its burdens and services. On this reasoning a particular estate for years was not allowed to support a contingent remainder in fee. The title, if attacked,

[Donovan v. Pitcher.]

could not be completely defended, because there was no one in being whom the tenant could pray *in aid* to support his right; and, upon a writ of right patent, the lessee for life could not join the *mise* upon the mere right. The particular tenant could not be punishable for waste, for the writ of waste could only be brought by him who was entitled to the inheritance." 4 Kent, 280. One of the reasons supporting the rule in Shelley's case was the prevention of an abeyance of the inheritance. A result of this doctrine was, that when lands were claimed by descent, the capacity to take must have existed in the heir at the instant of the death of the ancestor. "We have no doubt," say the supreme court of the United States, "that the correct doctrine of the English law is that the right to inherit depends upon the existing state of allegiance *at the time of the descent cast.*" *Dawson* v. *Godfrey*, 4 Cranch, 322. In the case of *People* v. *Conklin*, 2 Hill (N. Y.), 67, the same rule is affirmed, and subsequent naturalization declared not to operate retrospectively so as to confer capacity and prevent an escheat. Such would have been the operation of naturalization, if the title had been acquired by *purchase*, and not by *descent*. *Harley* v. *The State*, 40 Ala. 689. The distinction rested on the common law rule, that an alien could by purchase take an estate in lands, which was defeasible only by proper proceedings for an escheat at the instance of the king, or here at the instance of the State. Taking such an estate, defeasible only at the will of the sovereign, good as to all the world beside, the freehold was not in abeyance—it resided in him, until office found, and then rested in the sovereign. *Harley* v. *The State*, *supra*; *Jenkins* v. *Noel*, 3 Stew. 60; *Smith* v. *Zaner*, 4 Ala. 99. Having no inheritable blood, incapable of taking or of transmitting by descent, as the freehold cannot be kept in abeyance, without any inquest of office, it escheated and vested in the sovereign on the death of the alien, or when the ancestor died not leaving an heir capable of taking by descent. The law, which *nihil facit frustra*, will give no estate which it does not enable the donee to keep. 2 Kent, 15; 1 Scrib. Dow. 177; *Bartlett* v. *Waring*, 9 Port. 266; *Smith* v. *Zaner*, *supra*.

The capacity of the appellees to take the premises in controversy by descent must be determined by the law as it existed in 1859. If they had not capacity then, however it may have been enlarged by subsequent laws, such laws cannot operate restrospectively to divest an estate in lands which then vested in the State. Or, if it did not vest in the State, was in abeyance from the death of the ancestor, without a

[Donovan v. Pitcher.]

tenant, and without *seisin*, until the capacity of the appellees was enlarged.    At the death of the ancestor they were not citizens of the United States, nor were they, so far as any relation they could have with other States, or with the citizens of other States, citizens of Ohio.    They were merely residents of that State, entitled to whatever of right or privilege the law of the State granted them.    Such rights or privileges could at any moment have been withdrawn by Ohio, and without any positive violation of law, or any offense by the appellees, their continuous residence could have been forbidden.    Their condition was peculiar and anomalous.    It resulted from the mode in which their ancestors were originally introduced into this country, and the condition of inferiority and subordination to the dominant race to which the law consigned them.    They were not aliens, but natives, born within the dominion of the government. They were *inhabitants* and *subjects* of the State, bound to obey its laws, subject to its burdens, and entitled to protection in person, in life and liberty and property, so long as their residence was permitted.    The *status* they bore was entirely derived from the permission or grace of the State of residence.    It was a species of denization dependent on the donation of the State.    *Scott* v. *Sanford*, 19 How. 393.    The extent to which rights and privileges accorded to the free negro in the State of his residence would be recognized in other States, was dependent on the comity of such States. One State could and did recognize them to a greater extent than another.    All comity between States and citizens of different States, so far as rights, privileges and immunities are not guaranteed by the Constitution of the United States, rests on the principle that it cannot be extended, in violation of the laws and policy of the State.    The extension of comity in violation of the law and policy of the State would have been an abdication of the law and sovereignty of the State, and a recognition of the superiority, not the equality, of the foreign State.    Every State judged for itself, of the nature, extent, and utility of the recognition of foreign laws, respecting the state and condition of persons, and was not bound to recognize them when prejudicial to their own interests.    Story Conf. Laws, § 36.    The right of aliens to reside here, to acquire personal property, the succession of aliens to such property, has long been recognized.    Yet until recently, in this State, there was no relaxation of the rigid rule of common law, that they could not take, hold and transmit real estate.    The distinction between the two kinds of property, though it may be said to have had its origin in

[Donovan *v*. Pitcher.]

reasons not now of the practical importance and value formerly attached to them, was observed and enforced. It may well be conceded that in 1859, at the death of their ancestor, the appellees being residents of Ohio, entitled to rights and privileges under its laws, would, because of the comity extended by the States one to another, independent of constitutional guaranty, have been entitled to all the rights and privileges here of an alien, except that of residence, or to all the rights and privileges they enjoyed in Ohio, except so far as they were abridged by positive law, or a well defined public policy, without affecting the question presented. The law of this State then positively prohibited them from acquiring a residence here. If they came and did not depart in thirty days after warning, they became felons, subject to imprisonment in the penitentiary. Code of 1852, §§ 1033–1044. The question then resolves itself into the simple inquiry, can the residents of another State, incapable of residence here, without felony, take lands by descent—can they become freeholders of the State? The policy or spirit of the law then existing is not matter for our consideration or defense. It remained on the statute book for more than thirty years, was born of a necessity generated by the continued unconstitutional assault from abroad on the domestic institutions of the State, and contributed to preserve its peace and order. It was never doubted that its enactment lay within legislative competency, and it became obsolete only with the destruction of the institution it was intended to preserve. If any now denounce it as harsh, or cruel, or unjust, the denunciation should fall on those who created the necessity for, and not those whom self preservation compelled to its enactment. We cannot hold that one who is incapable of residence, or of acquiring citizenship here, can take lands by descent. One of the reasons, and perhaps that of greatest force now, which prevented an alien from taking lands at common law, was "because an interest in the soil requireth a permanent allegiance, which would probably be inconsistent with that he oweth to his own natural liege or lord." 1 Bac. Ab. 201. The reason why lands descending to an alien could not be taken by him, was that "the king could not oblige his person and services." *Ib*. 203. The man who cannot become subject to the laws of the State, amenable to the jurisdiction of its courts, cannot be obliged to the services of residence or citizenship—cannot be a freeholder. The freeholder was the *liber homo* of the common law, to whom the guaranties of *magna charter* extended, and if the lord gave an estate to a man and his heirs, he made the

[Donovan v. Pitcher.]

tenant a freeman, if he had not been so before.    1 Wash. on Real Prop. 29, 45.  " To constitute a perfect title there must be the union of actual possession, the right of possession, and the right of property.   These several constituent parts of title may be divided and distributed among several persons, so that one of them may have the possession, another the right of possession, and the third the right of property. Unless they all be united in one and the same party  there cannot be that consolidated right (that *jus duplicatum,* or the *droit droit,* or the *jus proprietatis et possessionis*), which, according to the ancient English law, formed a complete title." 4 Kent, 411.  · "A title is thus defined by Lord Coke :  *Titulus est justa causa possidendi id quod nostrum est;* or, it is the means whereby the owner of lands hath the just possession of his property."    2 Black. 195.    An estate of freehold is defined to be "the possession of the soil by a freeman." 2 Black. 103.   Thus, we see the right of possession is an essential element of a freehold estate.   An incapacity to take and hold such possession is of necessity inconsistent with its existence.   If this estate had devolved on the appellees, they could never have entered in possession, nor could they have conveyed to another the right of entry, because it was not in them to convey.   We concur in the argument of the learned counsel for the appellant, that the law does nothing vain or useless, and that it would have been an absurdity to cast on the appellees the descent of the premises, and yet have said to them, if you come to hold and enjoy, it is at the peril of becoming felons and punishable as such.

The question now presented was not decided in *Tannis* v. *St. Cyr,* 21 Ala. 449.   The court expressly say,  "It will be observed that we do not decide the question as to the right of a free person of color to inherit lands in this State, where the descent was cast since the passage of the act of 1832, and the heir was not a resident of this State on the 1st day of February of that year."   The argument of the court sustains our conclusion.   It rests on the ground that prior to the act of 1832 the residence of free persons of color was not inhibited.   The act of 1832, incorporated into the Code of 1852, did inhibit such residence and incapacitated them from the performance of the duties on which the common law founded the right of inheritance.

The court erred in the charge given and in the refusal to charge as requested, and the judgment must be reversed and the cause remanded.