## DUTTON v. DONAHUE
(No. 1729; Feb. 23, 1932; 8 Pac. (2d) 90)

For the intervener and appellant there was a brief by *James A. Greenwood,* Attorney General, *Richard J. Jackson,* Deputy Attorney General, and *George W. Ferguson,* Asst. Attorney General, all of Cheyenne, Wyoming, and oral argument by *Mr. Jackson.*

For the defendant and respondent Donahue, there was a brief and oral argument by *Thomas Hunter*, of Cheyenne, Wyoming.

For the defendants and respondents there was a brief by *Kinkead & Pearson* and oral argument by *Mr. W. C. Kinkead.*

BLUME, Justice.

On January 5, 1919, one Charles Clement Bell, a naturalized citizen of the United States, died intestate, seized of certain real estate in Laramie County, Wyoming, in controversy in this case. He was unmarried, and left as his only heirs his father, mother, and some brothers and sisters, all of whom were non-resident aliens, living in Great Britain. They, or their representatives, are plaintiffs in this case, and will hereafter be referred to as the alien heirs or as plaintiffs. The estate of Bell was administered, and closed by order of the court. The property was distributed to the alien heirs on July 15, 1921. On November 14th, 1928, these heirs entered into a contract with C. C. Donahue, a resident and citizen of this State, for the sale of the property in dispute, for the consideration of the sum of $2000. In view of the fact that the purchaser questioned the title, a supplemental agreement was entered into on March 6, 1929, by virtue of which the sum of $665.65 of the purchase price, and a promissory note for the remainder, were deposited in a bank till the title could be cleared. At the same time a deed to the premises by the alien heirs to the purchaser, duly executed, was also deposited, and the purchaser was put into the possession of the property so sold. In order to clear the title, the alien heirs thereupon,

on April 23, 1929, commenced an action in the District Court of Laramie County against Donahue, and the bank which held the money and papers above mentioned in escrow, to compel performance of the agreement of sale. Upon suggestion of the defendant, the State of Wyoming was made a party to the action. The State, by its attorney general, appeared, and on January 30, 1931, filed its second amended petition of intervention, claiming that by reason of the alienage of the plaintiffs, the property in controversy *ipso facto* escheated to the state, and asking that it be declared to be the owner thereof. Demurrer was filed to this petition, on the ground that it failed to state a cause of action. In the meantime and on December 5, 1930, the alien heirs filed in the cause their petition for an extension of time in which to sell and dispose of the property. It was admitted by counsel for the state in open court, that the reasons assigned by plaintiffs for the prolongation of time for sale were sufficient to justify the court in making an order for such prolongation, but objected thereto on the ground that the application therefor came too late. The court extended the time for such sale, sustained the demurrer to the state's petition of intervention, and dismissed it, and from this action of the court the state has appealed.

1. Our constitution, Art. I, Sec. 29, provides that resident aliens are entitled to inherit property the same as citizens. Section 7005, W. C. S. 1920, in force at the time of the controversy herein, provides that "the alienage of the *descendants* shall not invalidate any title to real estate which shall descend from him or her." In the case of Bamforth v. Ihmsen, 28 Wyo. 282, 308, 204 Pac. 245, 205 Pac. 1004, we gave the term "descendants" its literal meaning, and as excluding all collateral heirs, as well as ascendants. But it is now contended by the plaintiffs and the defendant Donahue that it should be construed as including all persons to whom property descends under the intestate laws of this state. It is, of course, possible that the legislature may have thought that descendants, literally taken,

meaning children, grandchildren, etc., should be treated better than collateral heirs or ascendants. The statute is somewhat indefinite, and its meaning, perhaps, not easily ascertainable, and in view of the fact that the decision herein can be based on other grounds, we leave the contention as to the meaning of the foregoing section undecided, and shall assume, for the purposes of this case, that the alien heirs involved herein, consisting of collateral heirs and ascendants, were not entitled to inherit the property in controversy under the provisions of that section.

2. The alien heirs herein were entitled to inherit real property in this state under the treaty with Great Britain (31 U. S. St. at Large, 1939), reading as follows:

"Where on the death of any person holding real property within the territories of one of the contracting parties, such real property would by the laws of the land, pass to a citizen or subject of the other, were he not disqualified by the laws of the country where such real property is situated, such citizen or subject shall be allowed a term of three years in which to sell the same, this term to be reasonably prolonged, if circumstances, render it necessary, etc."

We held in Bamforth v. Ihmsen, supra, that alien heirs, such as are involved herein, take title to real property defeasible after the expiration of three years or the proper prolongation of that time. That point is not contested by the state, but it is argued that the extension of time should have been applied for within the three-years' period, and in the probate court, and that in any event, when the extension of time was applied for herein on December 5, 1930, eleven years after the death of Bell, it came too late, notwithstanding the fact that, had it been applied for in proper time, the circumstances would have warranted the extension. That the application, however, need not necessarily be made in the probate court, and that the extension of time may be granted, or recognized, after the expiration of three years, is held in Bamforth v. Ihmsen, supra, as

well as in Fischer v. Sklenar, 101 Nebr. 553, 163 N. W. 867, and Scharpf v. Schmidt, 172 Ill. 255, 50 N. E. 182. These cases, it is true, did not involve a claim for an extension of time, as against a proceeding for escheat instituted by the state a number of years after the specific time mentioned in the treaties, and we prefer to leave undecided for how long, as against such proceedings by the state, property of non-resident alien heirs may remain unsold. In the case at bar the property was sold before such proceedings were instituted, and we think that we may rest the decision herein upon that state of facts.

3. The State claims that, in order to vest in it the title to the property in controversy, no proceedings for escheat were necessary, if the facts creating an escheat were in existence, as it claims is true in the case at bar, and we are cited to Sec. 39-102, Wyo. Rev. St. 1931, which provides:

"All property, real and personal, within the limits of this state, which does not belong to any person, belongs to the state. Whenever the title to any property fails for want of legal heirs, it reverts to the state."

Section 39-103 provides that:

"Whenever any property shall escheat or be forfeited to the state for its use, the legal title shall be deemed to be in the state from the time of the escheat or forfeiture,"

and that an information shall be filed and judgment shall be entered for the recovery of the land by the state. The latter section treats an escheat as being the same, or as of the same nature, as a forfeiture, and it is well known that forfeitures are not favored. We said in Bamforth v. Ihmsen, supra, that "we do not believe that all right of the heirs in the property ceased *ipsa facto* upon the expiration of the three years given under the treaty above mentioned." The state, it is true, was not a party to that case, and the statement quoted cannot, perhaps, be considered as deci-

sive here. So, in order to test the correctness of the contention of the state herein, and to arrive at the intent of the legislature, as expressed in the sections of the statute above mentioned, we shall consider the subject of escheat in the light of other decisions thereon. We may concede, for the purposes of this case, that, in the absence of a constitutional or statutory provision, or of a treaty, giving an alien the right to inherit, the property of a citizen who leaves only alien kindred, escheats and the title vests in the state without any inquest of office—that is to say, without any proceeding on behalf of the state asserting the escheat. Note 23 A. L. R. 1241. See 10 R. C. L. 609, 610. But a different question arises where the alien is entitled to inherit, even though he takes only a defeasible estate. Under the treaty heretofore mentioned, the aliens in this case were more favorably situated than grantees and devisees under the common law, inasmuch as they were entitled to hold the land in question for the period of three years and, if an extension was warranted, for the period of such extension. Hence principles of law should be applied to them which are at least as favorable as those applicable to grantees and devisees at common law. Now an alien grantee by purchase or devise could, at common law, take a title in fee simple, and hold it against all the world except the sovereign, until office found, and the title did not vest in the sovereign or the state without some proceeding to enforce the escheat. Note 23 A. L. R. 1244, 10 R. C. L. 610. He had a right to convey. 2 C. J. 1053, 1068. The only doubtful question is whether he could convey a title good against the sovereign. Kent in his Commentaries, 2, 61, states the rule as follows:

"Though an alien may purchase land, or take it by devise, yet he is exposed to the danger of being divested of the fee, and of having his lands forfeited to the state, upon inquest of office found. His title will be good against every person but the state, and if he dies before any such proceeding be had, we have seen that the inheritance cannot descend, but escheats of course. If the alien should undertake to sell to a citizen, yet the prerogative right of for-

feiture is not barred by the alienation, and it must be taken to be subject to the right of the government to seize the land. His conveyance is good as against himself, and he may by a fine, bar persons in reversion and remainder, but the title is still voidable by the sovereign upon office found.''

To the same effect is 2 C. J. 1068, Sec. 33.

Apparently Washburn, who wrote thirty-four years later than Kent, came to the opposite conclusion in his work on Real Property, where he states in Section 131 (6th Ed.) :

''Thus an alien may purchase lands or take them by devise and hold them against all the world but the state. Nor can he be divested of his estate even by the state, until after a formal proceeding called 'office found'; and until that is done, may sell and convey or devise the lands, and pass a good title to the same.''

The only cases cited by Kent are Bright's Lessee v. Rochester, 7 Wheat. 545, 5 L. Ed. 516, and a case without title, found in 4 Leon. 84, 74 Eng. Rep. 746, decided in the time of Elizabeth. The case in 7 Wheat. 545, 5 L. Ed. 516 is not in point. The case in 4 Leon. 84 is one of a few lines, and is as follows:

''Land was given to an alien in tail, the remainder over to another in fee, the alien suffered a common recovery, and died without issue; all this matter was found by office. It was moved, that this office should have return, so as upon the matter, the alien was not tenant of the land at the time of the recovery suffered; but the whole court held the contrary, and that the recovery was good, and should bind him in the remainder.''

''Common recovery'' was a fictitious suit brought by a third party against the holder of the estate in tail, with the ultimate object of barring both the estate in tail as well as the remainderman. The third person then either paid the tenant in tail for the land as a purchaser, or conveyed it back to him in fee simple. Washburn, supra, Sec. 186. In

the foregoing case, which was evidently a proceeding for escheat, the fictitious suit—the common recovery—was held to be good, apparently as against the remainderman who appeared in the case, and the property was held to have escheated. The rights of a third party are neither mentioned nor discussed, and in all likelihood, the fictitious suit had been instituted for the use and benefit of the holder of the estate in tail—the alien—as was true in the case, without title, reported in Gold. 102, 75 Eng. Repr. 1024, and that he, the alien, was the owner thereof in fee at the time of his decease. If this view of the case is correct, then it does not sustain the citation from Kent and has no bearing whatever on the point in controversy in the case at bar, and that this view is correct is indicated in Fish v. Klein, 2 Mer. 431, 35 Eng. Reprint 1004, decided in 1817, in which the court stated that whether a grantee of an alien was in a better situation than the latter was a new point which had never been decided. That case is the only one of the older cases, so far as we have been able to find, which—to a limited extent—appears to be in point. A decedent had devised his property to Klein, an alien, in trust for the former's wife, with power to sell. Klein sold some of the land and executed a conveyance. The purchaser, after having made an agreement to buy, objected to the title, on account of Klein's alienage, fearing that he would not get a good title. Thereupon Klein was naturalized through an act of Parliament. The objection was then made, that the Act of Parliament did not relate back, and that Klein should either make a new conveyance, or get a specific act of Parliament confirming the conveyance already made. It was held that a second conveyance should be made at the expense of the estate. The decision is short and is as follows:

"The master of the Rolls, Sir Wm. Grant, held, that the estate being out of the defendant (Klein) at the time when the act was passed, and the act itself being silent as to the conveyance in question, it was impossible to consider his

alienee in any better situation, as to title, than the defendant himself. But that, *as it was a new question, which had never been expressly decided,* the testator's general estate ought to be at the expense of putting it out of controversy." (Italics are ours.)

The case, accordingly, simply involved the costs of the execution of a new conveyance. It did not involve a proceeding by the sovereign, and we could hardly say that it should be of decisive effect here. A number of cases decided during the last century contain statements sustaining Kent's position. A list is contained in 23 A. L. R. 1249, to which may be added Harley v. State, 40 Ala. 689. But the statements are but *dicta,* and the question here in controversy was not involved. Nor can we find that the cases cited by Washburn are in point. The case of Territory v. Lee, 2 Mont. 124, makes a statement supporting Washburn, but that statement, too, is dictum. So that it would seem that the specific question involved here did not arise till recent times, in the cases which we shall hereafter consider, or at least that the rule of the earlier common law thereon is in grave doubt.

The case of De Merle v. Matthews, 26 Cal. 455, was a contest between private parties as to the title of land. Defendant traced his title partly through an alien and it was contended that the deed from the alien to his grantee was void. The court held that since no proceeding to forfeit his title had been brought by the government, it was thereafter too late to raise the question of alienage. The case is, accordingly, in point to a limited extent.

Mott v. Cline, 200 Cal. 434, 253 Pac. 718, 725, too, was a contest between private individuals, in which the title to real property was questioned on account of alienage, and the Supreme Court of California said:

"It (an escheat proceeding) is a governmental affair, a transfer made in violation of the (alien land) act being defeasible as to the state only. It is quite well settled that, in case title to real property is defeasible by reason of the

alienage of the owner, and said owner, before the power of the state is invoked in an escheat proceeding, conveys the property to a person eligible to hold it, as Mott unquestionably is, the infirmity of title is removed.''

Nearer in point is Abrams v. State, 45 Wash. 327, 122 A. S. R. 914, 13 Ann. Cas. 527, 88 Pac. 327, 331, a well considered case. Lou Graham, an alien woman, acquired property by purchase. She died intestate, and left only alien heirs. But under the constitution of Washington alien heirs could inherit by descent, just as the alien heirs in the case at bar could inherit under the treaty heretofore mentioned. The State became a party to a case thereafter commenced, and claimed the land in controversy under the right of escheat. It was held that the claim was made too late. In part the court said as follows:

''Being an alien, it follows that she (the alien) had no right to acquire title to real estate in this state by purchase, and the deed executed to her by the appellant Abrams was void in the sense that a forfeiture of the property might have been declared by the state at any time while it remained in her possession and under her control, she claiming title under such deed. This court, however, in the case of Oregon Mortgage Co. v. Carstens, 16 Wash. 165, 47 Pac. 421, 35 L. R. A. 841, supra, in substance held that an alien holding lands in this state by purchase under a defeasible title, subject to attack on the part of the state, might by deed transfer a good title to a third person entitled to receive and hold it, provided no proceeding had theretofore been taken by the state for the purpose of declaring a forfeiture or escheat. In other words, if Lou Graham, after receiving her deed from the appellant Abrams, had, for a good and sufficient consideration, conveyed the property to a third party entitled to receive title, the state of Washington could not thereafter, by office found, have forfeited such title as against her grantee. The state could, however, at any time prior to such transfer have successfully instituted proceedings to declare a forfeiture and escheat.''

In the case of State ex rel. v. Commercial Co., 46 Wash. 104, 89 Pac. 471, aliens, not entitled to hold real estate, con-

veyed property to a party entitled to hold. Thereupon the State brought an action claiming the right of escheat. Following the Abrams case the court held, that the State was too late. This ruling was followed and approved in the case of Prentice v. How, 84 Wash. 136, 146 Pac. 388, in which, however, the State was not a party. In the case of State v. Kosai, 133 Wash. 442, 234 Pac. 5, the State brought an action claiming the ownership of certain lands previously held by Kosai and wife, Japanese aliens, and not entitled to hold. But they had, prior to the commencement of the action, made a gift of the land to their child, a citizen of the United States. The gift, held to have been made in good faith, was sustained, the court saying in part:

"It must be granted that Kosai and wife had the right to dispose of the property either by gift or sale up to the time the state proceeded to escheat it under the alien land law. We have so held in a number of cases."

The principle of that case was again stated in the case of State v. Kurita, 136 Wash. 426, 240 Pac. 554. And the author in the note to 15 L. R. A. (N. S.) 380 came to the conclusion that

"it may be laid down as a general rule, gathered from all the authorities, that an alien, in the absence of statutory provisions to the contrary, may take land by purchase, that is by deed or devise, and hold the same against everybody but the state; and may, until the state interferes by an action instituted for the purpose of effecting an escheat, convey a good title by will or deed."

To the same effect is 10 R. C. L. 606, 611, 615.

The principle laid down by these authorities is further sustained by cases decided in connection with corporations. These, we think, are analogous, for it can make no difference whether the party incompetent to hold is an alien or a corporation. The analogy is clearly recognized in the Abrams case above cited, and in Louisville School Board

v. King, 127 Ky. 824, 107 S. W. 247, 251, 15 L. R. A. (N. S.) 379, and In Re Palmer W. G. Co., (D. C.) 183 Fed. 902 and in other cases. In 14a C. J. 563, it is said:

"Before proceedings are commenced by the state to escheat the land wrongfully held by a corporation, the corporation may sell and convey such property and a purchaser will take title free of any subsequent proceedings on the part of the state to establish an escheat. Notwithstanding the property is subject to escheat, a contractual grantee of the corporation may be compelled to complete his purchase."

A note on this subject is contained in 37 A. L. R. 204 and 62 A. L. R. 494, where a number of cases are cited, from various jurisdictions. And the rule seems to be without exception. A few of the cases involved a direct claim of escheat. That was true in the King case, supra. The purchaser of a lot, under a contract of sale, made objection to the title, and claimed that under the laws of Kentucky, the property had *ipso facto* escheated to the school board, on the ground that it was not necessary property to the business of the corporation which had previously held title, and because it had not been disposed of by such corporation within five years, as directed by law. The school board was made a party to the action. The court among other things said:

"Our conclusion is that the holding of useless real estate by a corporation for more than five years, while a cause or ground of escheat, does not *ipso facto* effect an escheat; in other words, that the title to the property, notwithstanding the existence of the grounds of escheat, remains in the corporation until an action for escheat shall have been instituted; and if, before this is done, the corporation bona fide sell and convey the property to a third person, the latter would be vested with an indefeasible title to the land."

Again the court said:

"We do not, by anything that is said in the opinion, mean that any sale and conveyance of its useless real estate,

made by the corporation after five years' holding thereof, would deprive the state of the right of escheat. If such conveyances were fraudulently made to prevent the escheat, it could be attacked by the state as any other fraudulent conveyance may be attacked, and, upon proof of the fraud, the conveyance set aside. But, if the conveyance be made by the corporation in good faith and for a valuable consideration before proceedings of escheat have been instituted by the state, the grantee will take a good title as against the state and school board as well as the grantor.''

And the same court, in the case of Louisville Ins. Co. v. Comm., 147 Ky. 72, 143 S. W. 1044, 1046, where the State sought, and was permitted to enforce, an escheat, said in part:

''Notwithstanding its holding of the real estate escheated more than five years, appellant might at any time before the institution by appellees of this action have protected it against escheat by a bona fide sale thereof to a purchaser for value, but having failed to do so, it will not be allowed, after the escheat is declared, to escape the consequences of its violation of the law.''

The Kentucky rule was approved in the case of State ex rel. v. Inv. & R. Assn., 107 Okl. 228, 232 Pac. 35, 37 A. L. R. 190, where the state sought to enforce escheat against property already conveyed, and in which a corporation had at least a defeasible title. The court said in part:

''It is admitted by plaintiff in error that in the case of an alien and of a corporation authorized to buy and sell land and to hold land for a number of years, the alien may make a valid conveyance at any time before escheat proceedings are begun, and that the corporation may also, after the expiration of the time limited by law, make valid conveyance at any time before the beginning of an action by the state. * * * The overwhelming weight of authority sanctions the doctrine that a corporation such as is involved here may, at any time before escheat proceedings are begun, divest itself of title to lands held in contravention of law by a conveyance in good faith for value, and a purchaser from such corporation takes good title by virtue of such convey-

ance. The policy of the law, as laid down by the courts of this state, does not favor escheats. * * * The object of the statute is to prevent the holding by the corporation. The transfer by the corporation has effected the object of the statute.''

Similar in effect are State v. Mission Society, 96 W. Va. 447, 123 S. E. 440, 37 A. L. R. 200.

Whatever, accordingly, may have been the rule of the early common law, it is clear from the foregoing authorities that at least according to the trend of modern thought, an alien who is entitled to inherit real property, but who takes only a defeasible estate, and one subject to be defeated by the state by an action brought, may, before the commencement of such action, dispose of property, in good faith, and convey title good against the world, including the state. We can find no good reason to dissent from that view. It seems to be a logical application of the rule heretofore stated and in force for four centuries (4 Q. L. R. 337), that in cases where such defeasible estate is held, the sovereign's title should be evidenced by office found. In the meantime, the right to convey good title as against the sovereign ought not to be in doubt. As stated in Groo v. Norman, 42 App. Cas. (D. C.) 387, 391, in speaking of a like situation of a corporation:

''A different rule might result in great hardship, for if the sovereign could challenge the title of the grantee * * * it could challenge the title of his grantee and so on. The question of the right * * * to hold real estate might be a close one, and a purchaser in good faith might accept a conveyance, relying partly upon the failure of the sovereign to challenge the title * * *, and later be compelled to defend the title which should have been challenged befor.''

In the case at bar, a contract of sale was made in good faith, for a valuable consideration, and a conveyance of the property had been executed, before the state made any claim for escheat. True, the conveyance was delivered only

to a third party for the benefit of the purchaser, but the transfer would have been complete except for the doubt raised by the purchaser as to whether or not the state had any right or claim to the land. We think that to all intents and purposes the sale and conveyance should be considered completed, so far as the state is concerned. It is argued that no innocent purchaser is involved, since the money is still in escrow, and that, hence, the claim of the state should not be held barred. None of the cases require an innocent purchaser in that sense. Some of the cases apparently say that the conveyance should be for a valuable consideration. But as noted, the Supreme Court of Washington has held that an alien may pass a good title by gift. The real requirement is that the transfer from the alien to one entitled to hold must be in good faith, and not merely a sham, the transferee still holding the land through a third person. When a valuable consideration is paid, absence of such sham would, at least generally, be clear, and that element would be of importance only in that connection. Moreover, if there were any doubt on these points, it should, we think, be resolved against the state. The rapacity or the necessities of a king may have led him at times to grasp property notwithstanding the fact that the purposes of the law— that an alien should not hold in contravention of law—had been substantially complied with, as is true in the case at bar. But the dignity of the modern state, and the trend of modern thought, does not require or permit that the sovereign should be enriched as a result of a slight technicality. England, the home of the common law, has even gone so far as to entirely abolish the right of escheat on account of alienage, and has put citizens and aliens upon an equal footing in that regard. And that is true in some of our own states.

We think that the judgment herein should be affirmed, and it is so ordered.

*Affirmed.*

KIMBALL, Ch. J., and RINER, J., concur.